**ALLIEDSIGNAL, INC., Plaintiff,**

v.

**AMCAST INTERNATIONAL CORP., Defendant.**

**No. C–3–92–013.**

United States District Court,
S.D. Ohio,
Western Division.

Jan. 12, 2001.

the fifteen year sentence Petitioner received pursuant to the ACCA, does raise a constitutional issue.

Nicholas Charles Hollenkamp, Kathryn Anne Lamme, Dinsmore & Shohl LLP, Dayton, OH, David C. Toomey, Lisa W. Clark, Gerald J. Pappert, Seth Cooley, Duane Morris Heckscher LLP, Philadelphia, PA, for plaintiff.

Donald Jeffrey Ireland, Ann Wightman, Faruki Gilliam & Ireland, Dayton, OH, for defendant.

DECISION AND ENTRY AWARDING PLAINTIFF THE SUM OF $3060.00 FOR ATTORNEY'S FEES INCURRED AS A RESULT OF DUPLICATIVE TRIAL PREPARATION MADE NECESSARY BY COUNSEL FOR DEFENDANT'S UNTIMELY NOTIFICATION THAT SHE WOULD BE SEEKING A CONTINUANCE; FINDINGS OF FACT; EXPANDED OPINION; CONCLUSIONS OF LAW; PROCEDURES SET FORTH TO BE FOLLOWED BY COUNSEL

RICE, Chief Judge.

For a number of years, the Plaintiff disposed of waste from a coal tar products plant it operated in an abandoned sand and gravel pit in Ironton, Ohio, known as the Goldcamp Disposal Area ("GDA"). The Defendant, which operated a foundry in Ironton, also dumped wastes into the GDA. After the United States Environmental Protection Agency ("EPA") placed the GDA on the National Priorities List ("NPL"),[1] Plaintiff entered into two agreements with the EPA, under which it agreed to investigate the environmental hazards at the GDA and to clean up that facility. Through December 31, 1994, the Plaintiff had incurred response costs in excess of $12,000,000 to comply with those agreements, and it is estimated that the total cost will be $30,000,000. The Plaintiff brought this action, seeking to recover a portion of the more than $12,000,000 that it had expended through 1994, under §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f).[2] In addition, the Plaintiff seeks a declaratory judgment that the Defendant is liable for costs it has incurred since 1994 and that it will incur in the future, as well as prejudgment interest. The Defendant has asserted a counterclaim against the Plaintiff, seeking contribution from the latter, pursuant to § 113(f) of CERCLA.[3] This matter was tried with the Court sitting as finder of fact. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court now states its Findings of Fact separately from its Conclusions of Law.

1. In addition to the GDA, the EPA has also placed the Plaintiff's Ironton coke plant/lagoons area on the NPL. Defendant did not contribute waste to that hazardous waste site, and the cleanup of that site is not at issue in this litigation.

2. The Plaintiff also asserted a claim for contribution under the law of Ohio. However, after trial, the Plaintiff withdrew that claim. See Doc. # 184 at 1 n. 1. Therefore, the Court does not address the merits of that claim in this Decision.

3. The Defendant also asserted counterclaims arising under the common law of Ohio; however, during the trial of this litigation, the Defendant voluntarily dismissed those claims, pursuant to Rule 41 of the Federal Rules of Civil Procedure. See VI Transcript (Doc. # 166) at 29–30.

However, before setting forth its Findings of Fact and Conclusions of Law, the Court will rule upon the Plaintiff's request that the Defendant be required to compensate it for a portion of the attorney's fees it incurred to prepare for trial herein. Although the trial of this litigation was initially scheduled to commence in August, 1994, it was continued until February, 1995, at the request of Defendant's counsel. That continuance was granted because one of the Defendant's attorneys was scheduled to give birth within a matter of weeks of the date upon which the trial had been scheduled to commence. Defendant's counsel did not, however, inform her counterpart that she would be seeking a continuance until June 16, 1994. The Court granted the requested continuance on June 24, 1994. Since the Plaintiff's counsel had begun trial preparation, when Defendant's counsel mentioned that she would be seeking a continuance, this Court, in its Decision of February 10, 1995 (Doc. # 156), conditionally sustained the Plaintiff's request that the Defendant be required to compensate it for a portion of the attorney's fees it had incurred to prepare for trial which had been scheduled to commence in August, 1994. This Court conditionally sustained the Plaintiff's request (rather than sustaining it outright), because the Plaintiff had not documented the amount of time that its counsel had expended in trial preparation, before being informed by Defendant's counsel on June 16th that she would be seeking a continuance, and, further, because Plaintiff's counsel had failed to provide a reasonable explanation as to why he had continued to prepare for trial between June 16th, the date on which Defendant's counsel told her counterpart that she would be seeking a continuance, and June 24th, the date on which the Court granted Defendant's request for a continuance. Doc. # 156 at 2.

In addition, the Court was unable to ascertain "what trial preparation, undertaken and accomplished in order to prepare for the February 6, 1995, trial date, proved to be duplicative of that which had been undertaken in advance of the previously established trial date of August 15, 1994." *Id.* Accordingly, the Court directed the Plaintiff's counsel to submit an additional filing, documenting the amount and extent of trial preparation expended for the August, 1994, trial date, which was:

(1) undertaken prior to June 16, 1994, when Defendant's counsel advised that she would be seeking a continuance of the then established trial date of August 15, 1994; (2) undertaken between June 16, 1994, when so notified that a continuance would be sought, and this Court's granting the Defendant's Motion for Continuance, during a telephone conference call on June 24, 1994; and (3) undertaken and accomplished for the February 6, 1995, trial, which, in actuality, proved to be duplicative of that undertaken by Plaintiff's counsel for the continued trial date of August 15, 1994.

*Id.* at 3. The Court also afforded Defendant the opportunity to file a responsive memorandum. The parties have submitted memoranda and documentation on this issue (*see* Docs. # 182 and # 183), and the Court now turns to its resolution.

 The Plaintiff has requested that the Court require the Defendant to compensate it the sum of $6,000.00, for duplicative trial preparation. The Plaintiff has supported that request with an affidavit of its counsel, David Toomey ("Toomey"), to which invoices that were submitted to the Plaintiff are attached.[4] In his affidavit, Toomey focuses solely upon trial preparation that occurred during May and December, 1994, and has provided invoices for only those months. He has highlighted those invoices to indicate what portion of a

---

4. The affidavit also authenticates those in- voices.

particular entry of time was for trial preparation. Toomey has also added a column to the invoices for trial preparation time. According to Toomey, he and co-counsel billed their client $14,176.50, for 89.6 hours expended for trial preparation during the month of June, 1994.[5] Toomey states that a significant portion of the trial preparation that was undertaken in June, 1994, was expended to draft the Final Pretrial Order. During December, 1994, Plaintiff's counsel expended 107 hours on trial preparation, billing their client $21,091.00. According to Toomey, a significant portion of the trial preparation undertaken during December, 1994, was also devoted to drafting the Final Pretrial Order. Based upon his knowledge of what was done to prepare for the trial of this lawsuit, as well as his experience as a trial lawyer, Toomey opines that $6,000.00 is a reasonable estimate for duplicated time. Toomey does not otherwise explain his estimate.[6]

In opposing the Plaintiff's request for an award of attorney's fees, the Defendant argues that the Plaintiff erroneously presumes that much of the effort that its counsel expended in June, 1994, had to be duplicated in December of that year. According to the Defendant, much of the activity set forth in the invoices attached to Toomey's affidavit, should have been completed in June, if done properly. Thus, the Defendant contends that any duplication in effort was for the benefit of the Plaintiff, for which it (Defendant) should not be required to provide compensation. In addition, the Defendant argues that Toomey has failed to present sufficient basis for his opinion that $6,000.00 is a reasonable estimate of the expenses incurred by his client for duplicative effort. Finally, the Defendant argues that the description of the services performed, set forth on the invoices, fails to provide sufficient detail to show the precise pretrial activities performed, thus causing it to guess at what activities actually took place.[7]

---

5. Of that sum, Toomey states that $11,448.00 was for time expended on trial preparation before June 16th, while $2,756.00 was for trial preparation after that date. The Court notes that the sum of those two figures is $14,204.00. Toomey does not explain how he arrived at the figure of $14,176.50.

6. Toomey also states that his client has been billed the normal hourly rate for each attorney who preformed services. In its memorandum, Plaintiff argues that it is appropriate to compensate it at the normal hourly rates charged by its attorneys. This Court agrees. The Court conditionally sustained the Plaintiff's request for an award of attorney's fees, because Defendant's counsel had failed to notify her counterpart, in a timely fashion, that she would be seeking a continuance, thus causing Plaintiff to incur expenses for trial preparation which would later need to be duplicated. In other words, the Court is shifting the expenses incurred by Plaintiff for wasted trial preparation to the Defendant. Therefore, it is appropriate to require the Defendant to compensate the Plaintiff for the hourly rates charged by its attorneys, since the Plaintiff incurred expenses on that basis, even though those rates may exceed those which are normally charged in this area of the country.

7. One issue previously identified by the Court was the failure of Plaintiff's counsel to explain why he continued trial preparation, after being informed on June 16th by his counterpart that she would seek a continuance. In his affidavit, Toomey explains that trial preparation continued, in large measure, because it is often more efficient to complete a task than to stop in the middle of the effort. In addition, he stated that some work continued, because he was not certain that the Court would grant the requested continuance. The Defendant has not argued that the Plaintiff acted unreasonably by continuing with trial preparation after June 16th. The Court finds Toomey's explanation to be reasonable and, therefore, will not deny any portion of the requested fees, merely because Plaintiff's counsel continued to engage in trial preparation after June 16th.

This Court agrees with the Defendant that the Plaintiff's documentation of the expenses that it incurred for duplicative trial preparation by its counsel is somewhat meager.[8] For instance, Toomey's estimate of $6,000.00 is not supported other than by his statement that it is based upon his knowledge of this case and his experience as a trial lawyer. In addition, the descriptions in the invoices submitted by the Plaintiff of the activities undertaken (particularly those by Toomey) lack detail.[9] Those descriptions do not allow the Court to determine whether activity undertaken in December was duplicative of that performed in June, or whether the December activity merely constituted a completion of that which began in June. Nevertheless, the Court cannot agree with Defendant that the Plaintiff should be denied any recovery of fees. The uncontroverted evidence before the Court is that Plaintiff's counsel engaged in significant trial preparation, before Defendant's counsel gave notice that she would be requesting a continuance. One cannot put aside a task, as complex as preparing for a trial of this nature, for a period of months, without, at a minimum, having to engage in the duplicative activity of once again "coming up to speed." Moreover, Toomey states that he and co-counsel were, indeed, forced to engage in duplicative activity as a result of the continuance.

Therefore, the Court is left with two, equally firm convictions: 1) that the Plaintiff has failed to justify, in an adequate fashion, Toomey's estimate that $6,000.00 is a reasonable estimate for the expenses his client incurred as a result of the duplicative work performed by counsel, which was occasioned by Defendant's untimely request for the continuance; and 2) that it would be improper to deny all recovery to the Plaintiff. The Court deems it appropriate to award Plaintiff the sum of $3060.00. That sum is based upon the premise that the Plaintiff's counsel undertook some duplicative activities in December, if for no other reason than to become familiar once again with the nuances of this case, after the five month delay occasioned by the continuance.[10] Three individuals were involved in trial preparation in both June and December. The Court deems it appropriate to compensate the Plaintiff for six hours of time at the normal hourly rate of each of those three individuals, which was, at the time in question, $275.00, $165.00, and $70.00, respectively, for a sum of $3060.00.[11]

Accordingly, the Court orders the Defendant to pay the Plaintiff the sum of $3060.00, as compensation for the expenses incurred by the latter for duplicative trial preparation made necessary by the untimely notification by Defendant's counsel that she would be seeking a continuance. Having resolved that issue, the Court now

8. The Court cannot, however, accept the Defendant's assertion that there is no basis for awarding fees to the Plaintiff, because its counsel should not have needed to perform trial preparation a second time, since Defendant has failed to present evidence to support that assertion.

9. For the month of December, 1994, Toomey has repeated entries that say no more than "trial prep." or "pretrial prep."

10. According to the Defendant, only a few additional documents were discovered, and no new witnesses came to light, during that hiatus. See Doc. # 183 at 3. Therefore, the Court deems it proper to conclude that the period between June and December was one of relative inactivity in this litigation.

11. As an alternative to the method selected herein, the Court could conduct a hearing on the issue. That alternative is not attractive, since it could quite possibly cost the parties more than the amount that is at issue with the Plaintiff's request for fees.

turns to its Findings of Fact and Conclusions of Law on the merits of this litigation.

## I. Findings of Fact

### A. The Parties, their Operations and the GDA

1. Plaintiff AlliedSignal, Inc. ("Plaintiff" or "Allied"), is a Delaware corporation, whose principal place of business is located within the state of New Jersey. Plaintiff is the successor corporation to Allied Chemical Corporation.[12]

2. Defendant Amcast Corporation ("Defendant" or "Amcast") is an Ohio corporation, whose principal place of business is located within this state. Until December, 1983, Defendant conducted business under the names of Dayton Malleable Iron Company and Dayton Malleable, Inc. In December, 1983, the Defendant adopted its current name.[13]

3. At all relevant times, Plaintiff operated two, related industrial facilities in Ironton, to wit: a coke plant and a coal tar plant. At the latter facility, Plaintiff processed coal tar, a by-product of its coking operations. This litigation arises out of the Plaintiff's activities at its coal tar plant, and the disposal of the wastes generated at that facility. Plaintiff produced coal tar pitch, creosote oils, phthalic anhydride, anthracene and naphthalene at the coal tar plant. Those processes generated high levels of hazardous waste, including polycyclic aromatic hydrocarbons ("PAHs"), some of which were carcinogenic.[14] The PAHs generated at Allied's coal tar plant included benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(ah)anthracene, chrysene, acenaphthlene, anthracene, fluorene, fluoranthene, naphthalene, phenanthrene, pyrene and 2 methylnapthalene. Of those PAHs, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(ah)anthracene and chrysene were carcinogenic. In addition, the Plaintiff's processes generated ammonia and chlorides.

4. Beginning in 1916, and continuing through December, 1983, Defendant operated a malleable iron foundry in Ironton. At that facility, the Defendant manufactured products by pouring molten metal into sand molds. The sand molds were prepared by mixing together sand, water, bentonite clay, seacoal and either cereal (such as flour) or sawdust.[15] Defendant's facility, like other foundries, recycled the sand that it used in the molds, so that the sand would be repeatedly used. After a point, however, all sand used by the Defendant was discarded and replaced by new sand.

5. During the Defendant's manufacturing process, molten metal would be poured into a sand mold, which contained a small amount of seacoal. When the molten met-

---

**12.** For purposes of convenience, the Court will not distinguish in this Decision between Plaintiff and its predecessor. Rather, the Court will use "Plaintiff" or "Allied," regardless of whether the action was taken by the Plaintiff or that predecessor.

**13.** The parties have stipulated that Defendant's name change does not affect its liability in any respect. Final Pretrial Order at 5.

**14.** PAHs are also called polynuclear aromatic hydrocarbons. PAHs are found in all spent fuels. Many of the PAHs found in Plaintiff's waste were created at its coke plant, as a result of coal being heated in an oxygen deprived environment. Coal tar, a by-product of Plaintiff's coking operations and the product processed at its coal tar plant, has a high PAH content.

**15.** Seacoal is finely ground coal. It is indistinguishable from the coal used by the Plaintiff in its coke plant. The mixture of sand, water, bentonite clay, seacoal and either cereal (such as flour) or sawdust contained from 2% to 4% seacoal.

al came into contact with the seacoal, much of that material was completely burned. A second portion did not ignite at all. A third portion of the seacoal was partially burned and, thus, was transformed into PAHs, through a process called pyrolysis.[16] The PAHs generated through that process are the same as those which were generated through the Plaintiff's industrial processes. Thus, the Defendant generated the following carcinogenic PAHs, to wit: benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(ah)anthracene and chrysene. However, the quantity of those chemicals formed by the Defendant's processes was much smaller than that which resulted from the Plaintiff's operations.

6. Beginning in 1945 and continuing until 1977, Plaintiff disposed of all of the industrial wastes which were generated at its coal tar plant in the Goldcamp Disposal Area ("GDA"), an abandoned sand and gravel pit. The GDA is located in Ironton, next to the Ohio River, adjacent to Plaintiff's coal tar plant and four to five blocks from Defendant's foundry. That site encompasses approximately eleven acres, of which approximately three were used to dispose of waste. Beginning in approximately 1950 and continuing through 1977, Defendant disposed some of its foundry wastes in the GDA.[17] In 1955, Plaintiff purchased the GDA from its former owners, Henry and Margaret Goldcamp, after which Plaintiff exercised control over the waste disposed of at that site.[18] Over the years, other entities also disposed of very small quantities of waste at the GDA.

7. In 1977, all waste disposal at the GDA ceased. In 1979, the Plaintiff, under the supervision of the Ohio Environmental Protection Agency ("OEPA"), closed the GDA and covered it with a semi-permeable cap.

## B. Waste Disposed of at the GDA

8. Between 1945 and 1977, the Plaintiff disposed of all the waste it generated from its coal tar plant into the GDA. The Plaintiff's waste was largely organic. A substantial portion of that waste was in a semisolid or liquid state. The Plaintiff disposed of 29,759 tons of anthracene residue, which had a 65% PAH content. In addition, the Plaintiff disposed of 9,000 tons of anthracene salts, which consisted of 100% PAHs. Plaintiff also disposed of 2,000 tons of creosote spillage, 1,592 tons of coal tar residues and 32,005 tons of coal tar pitch, all of which had a 10% PAH content.[19]

9. Between 1950 and 1977, the Defendant dumped a significant amount of waste into the GDA. The Defendant's waste was largely inorganic, comprised primarily of sand.[20] The Defendant delivered that

---

16. The PAHs were formed during Defendant's manufacturing operations, when molten metal, poured into a mold, would burn some of the seacoal, thus depleting the oxygen and allowing some of the remaining seacoal to be transformed into PAHs. Only partially burned seacoal, rather than that which was completely combusted and that which did not ignite, was transformed into PAHs through pyrolysis.

17. Among other locations, Defendant also disposed of its foundry waste at a large area along the Ohio River and in the "Ninth Street pit." The EPA has not ordered remediation at either of those locations or at any other location used by Defendant to dispose of its foundry wastes.

18. Before Plaintiff purchased the GDA, both Plaintiff and Defendant had disposed of waste at that location, with the permission of its owners. After that transaction, Plaintiff had allowed the Defendant to continue to deposit wastes at that site.

19. In addition, the Plaintiff dumped 7,313 tons of non-process waste, drums and pallets and 12,000 tons of slag into the GDA. There is no evidence that this waste had a PAH component.

20. In and of itself, the sand disposed of by Defendant at the GDA poses no risk to the environment.

waste to the GDA in dump trucks, which its employees unloaded. That waste included spent foundry sand, broken cores which Defendant had used in its casting process, waste from the foundry's cupolas and other miscellaneous waste generated at that facility. Included with the spent foundry sand were small quantities of the following carcinogenic PAHs, to wit: benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(ah)anthracene and chrysene. When the Defendant dumped its spent foundry sand into the GDA, the carcinogenic PAHs were bonded to the individual grains of sand. The Defendant's waste also included phenolics.

10. The wastes of both parties were deposited into the GDA, side by side. In other words, Plaintiff's waste was not placed in one area of the facility, with Defendant disposing of its waste in another. Frequently, the waste of the two parties was mixed together by a bulldozer operated by employees of the Plaintiff.

11. PAHs are not normally soluble. As a result, the PAHs that were bonded to the spent foundry sand that the Defendant had deposited into the GDA were not likely to leach, i.e., to migrate from that sand to the groundwater which lay below that waste site, through the normal action of rainwater. However, the Plaintiff deposited anthracene waste into the GDA, in liquid form and at a high temperature. When that hot, liquid anthracene waste mixed with the spent foundry sand deposited by the Defendant, it had the effect of scrubbing off the PAHs bonded to that sand. The PAHs contained in the Defendant's waste stream then became mixed with and indistinguishable from those compounds which the Plaintiff had deposited into the GDA, producing "mixed PAHs."

12. Some of the mixed PAHs, which had been contributed to the GDA by both the Plaintiff and the Defendant, then migrated through the soil and were able to reach the groundwater in the aquifer which lay below the GDA. Being insoluble,[21] those compounds did not mix with the water; rather, they sank until they reached the bedrock at the bottom of the aquifer, since the molecular weight of the PAHs was greater than that of the water in the aquifer. Those PAHs, referred to as nonaqueous phase liquids, remain at the bottom of the aquifer and constitute the NAPS layer.[22]

13. By volume, Plaintiff contributed 72% of the waste to the GDA, while Defendant deposited 28% of that waste. In addition to depositing a greater quantity of waste into the GDA, the hazardous component of Plaintiff's waste was much greater. Although the waste streams generated by the Plaintiff and the Defendant both contained PAHs, the Plaintiff deposited 97% to 98% of the total amount of those compounds that went into the GDA, while Defendant was responsible for the remaining 2% to 3%. In addition, Plaintiff's practice of depositing hot, liquid anthracene waste allowed the PAHs, which had been formed during the Defendant's industrial processes, to be released from the spent foundry sand and ultimately to reach the groundwater in the aquifer.

14. The parties have stipulated that the carcinogenic PAHs, deposited into the GDA and released into the groundwater from it, are hazardous substances under CERCLA.

---

21. An insoluble substance is one which is not capable of being dissolved in a liquid, such as water.

22. NAPS is an acronym for "nonaqueous phase substances." The particular molecules of PAHs in the NAPS layer that came from the Plaintiff are indistinguishable from those that originated with the Defendant.

*C. The Cleanup of the GDA*

15. In 1982, the OEPA had demanded that Allied and Amcast jointly pay $35 million to clean up the GDA. Subsequently, the OEPA withdrew its demand that Defendant fund the cleanup. In 1983, the EPA placed the Allied Chemical/Ironton Coke facility on the NPL. The EPA divided that hazardous waste site into two operable units, to wit: the GDA and the coke plant/lagoons area. This litigation involves only the GDA.

16. On April 11, 1984, Plaintiff entered into an Administrative Consent Order with the EPA and the OEPA, under which it agreed to perform and to fund a Remedial Investigation/Feasibility Study ("RI/FS") at the GDA. Defendant is not a party to that Order. Plaintiff expended approximately $1,162,000 to complete the RI/FS. Defendant has not paid any portion of the funds so paid. The Plaintiff performed the RI/FS under the close direction and supervision of the EPA and the OEPA.

17. During the RI/FS, Plaintiff did not characterize the waste that parties other than itself and Defendant had deposited at the GDA. In addition, Plaintiff did not document any analytical testing of either its wastes or those of Defendant that had been so deposited.

18. On September 29, 1988, the EPA issued a Record of Decision ("ROD") for the GDA. That document adopted a remedy that is composed of three major components. *First,* the ROD requires that a cap, which complies with the Resource Conservation and Recovery Act, be placed over the surface of that facility. *Second,* the ROD requires that a low permeability slurry wall be constructed to surround the GDA. That slurry wall must extend from the surface to the bedrock below the GDA,

in order to prevent hazardous substances released from that facility from migrating further into the environment. *Third,* the groundwater, both inside and outside the slurry wall containment system, must be extracted and treated, until stipulated cleanup standards are achieved.

19. In addition, the ROD required that a study be conducted of the NAPS layer. The Plaintiff conducted that study between November, 1990, and February, 1993, at a cost of $800,000,[23] a sum to which the Defendant contributed nothing. As a result of that study, the EPA has not altered the selected remedy for the GDA hazardous waste site.

20. The primary concern at the GDA hazardous waste site is the groundwater. The ROD established cleanup standards for seven chemicals, to wit: ammonia, which must be reduced to 0.5 parts per million; chloride, which must be reduced to 250 parts per million; total cyanide, which must be reduced to 0.2 parts per million; phenolics, which must be reduced to between 0.3 and 3.5 parts per million; benzene, which must be reduced to 0.005 parts per million; naphthalene, which must be reduced to 0.69 parts per million; and benzo(a)pyrene, a carcinogenic PAH, which must be reduced to 0.005 parts per *billion.*[24] Given that the cleanup standard for benzo(a)pyrene, a carcinogenic PAH, is so much more stringent than that for any other substance, that carcinogenic PAH is driving the cleanup of the groundwater that lies below that hazardous waste site. In other words, when the benzo(a)pyrene has been sufficiently removed from the groundwater, the remedy at that facility will have been completed. Except for benzo(a)pyrene, Defendant's waste either did not contain the chemicals for which clean-

---

23. The parties stipulated that the Plaintiff had expended approximately $800,000 to study the NAPS layer.

24. Benzo(a)pyrene is a surrogate for and represents all carcinogenic PAHs that have been released from the GDA.

up standards were established in the ROD, or the concentrations of those chemicals which were contained therein were below those standards.

21. On March 9, 1989, the EPA issued an Administrative Order, directing both the Plaintiff and the Defendant to implement the remedy selected by the EPA and set forth in the ROD. In particular, the Plaintiff and the Defendant were ordered to submit, within 60 days of the entry of the order, a plan for the remedial design/remedial action ("RD/RA") phase of the cleanup.[25] Plaintiff has complied with that order, while the Defendant has declined to participate. On a number of occasions, Plaintiff has asked the EPA to take action against the Defendant for its refusal to participate the RD/RA phase of the cleanup. The EPA has not taken any such action against the Defendant.

22. Through December 31, 1994, the Plaintiff had expended the sum of $12,423,137, in connection with the cleanup of the GDA. That sum is composed of $1,162,000, to conduct the RI/FS; $800,000, to study the NAPS layer; and $10,461,137, to implement the ROD by conducting the RD/RA. It is expected that the total cost of cleaning up the GDA will be $30,000,000. The Defendant has not contributed any money to the cleanup process.

### D. Defendant's Liability under CERCLA

23. Defendant arranged for the disposal of hazardous substances, including the carcinogenic PAH, benzo(a)pyrene, at the GDA.

24. The GDA is a site where hazardous substances, including the carcinogenic

PAH, benzo(a)pyrene, have been deposited.

25. The hazardous substances deposited into the GDA, including those contributed by the Defendant, have migrated from the GDA to the groundwater which lies below that facility.

26. As a result of the release of hazardous substances from the GDA, the Plaintiff, through December 31, 1994, had incurred necessary response costs in the sum of $12,423,137, has continued to incur those costs after that date and will continue to incur such costs in the future.

27. The Plaintiff has incurred its response costs in compliance with the two orders issued by the EPA, pursuant to § 106 of CERCLA, 42 U.S.C. § 9606. Indeed, the EPA and the OEPA have closely directed and supervised the activities of the Plaintiff with regard to the RI/FS, the study of the NAPS layer and the implementation of the ROD.

28. The Plaintiff has incurred those costs in substantial compliance with the National Contingency Plan ("NCP").

29. Defendant is liable for 2% of the response costs incurred by the Plaintiff, through December 31, 1994, for all tasks except the cap for the GDA. Defendant is liable for 28% of the cost of the cap.[26]

### II. Opinion

In its Complaint (Doc. # 1), the Plaintiff sets forth a claims under §§ 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f), requesting that the Court order the Defendant to pay for a portion of the expenses it (Plaintiff) had incurred through December 31, 1994.[27] In addition,

25. At the time this case was tried, the slurry wall had been completed, while construction of the cap and the infrastructure required to pump and to treat the groundwater was ongoing.

26. Unlike the cleanup of the contaminated groundwater below the GDA, the need for a cap is not driven by the presence of carcinogenic PAHs disposed of in that hazardous waste facility.

27. As the Court has indicated above, the

the Plaintiff requests that the Court enter a Declaratory Judgment, requiring the Defendant to pay a portion of the costs it (Plaintiff) has incurred since the end of 1994 and will incur in the future, and, finally, that the Court award it prejudgment interest. As a protective measure, the Defendant has asserted a counterclaim against the Plaintiff, seeking contribution.[28] To resolve the Plaintiff's claims and Defendant's counterclaim, the Court must address the following categories of issues, to wit: 1) may CERCLA be applied retroactively and is that statute constitutional; 2) is the Plaintiff's claim one for contribution, under § 113(f), or is it entitled to maintain a cost recovery action under § 107(a); 3) is the Defendant liable under CERCLA; 4) for what portion of the expenses Plaintiff had incurred through the trial of this litigation is the Defendant liable; and 5) is the Plaintiff entitled to the requested declaratory relief and/or prejudgment interest? The Court will address those issues in the above order.[29]

## A. Retroactive Application and Constitutionality of CERCLA

On September 30, 1996, this Court entered an Order (Doc. # 189), in which it invited the parties to submit memoranda addressing *United States v. Olin*, 927 F.Supp. 1502 (S.D.Ala.1996), *reversed*, 107 F.3d 1506 (11th Cir.1997), in which the District Court had concluded that CERCLA could not be applied retroactively to activity which occurred before its effective date, December 11, 1980, and that Congress had exceeded the authority granted to it by the Commerce Clause, Article I, § 8, Clause 3, of the United States Constitution, when it enacted CERCLA. The parties have submitted their memoranda. *See* Docs. ## 190–92. In its memoranda, the Plaintiff states that it considers *Olin* to have been decided correctly by the District Court.[30] Indeed, the Plaintiff and a number of other corporations filed an amicus brief in the Eleventh Circuit supporting the District Court's decision therein.[31] That said, however, the Plaintiff points out that *Olin* was a decision by only one District Judge and that it has not been followed by other courts. The Plaintiff contends that, therefore, reliance upon the decision of the District Court in *Olin* may

Plaintiff has voluntarily withdrawn its claim for contribution under the Ohio common law. Therefore, this Court does not address the merits of that claim. Accordingly, there is no need to address the Defendant's argument that it is entitled to judgment on that claim. *See* Doc. # 178 at 43.

**28.** The Defendant's counterclaim is predicated upon the possibility that the Plaintiff may be entitled to maintain a cost recovery action under § 107(a), thereby making the Defendant liable for all expenses which the Plaintiff has incurred. To protect itself from that eventuality, the Defendant has filed a counterclaim, seeking contribution from the Plaintiff.

**29.** Of course, the manner in which a particular category of issues is resolved may obviate the need to address others.

**30.** The parties filed their memoranda, before the Eleventh Circuit had issued its decision in *Olin*, reversing the District Court. Throughout the following discussion, the Court employs the phrase *"Olin* court" to mean the decision of the District Court.

**31.** If this Court were to follow the decision of the District Court in *Olin*, the Plaintiff could not prevail in this litigation. However, the universal adoption of that decision would relieve Plaintiff of liability under CERCLA for all other hazardous waste sites at which it is a potentially responsible party. Thus, the Plaintiff's support of that decision is not illogical.

be premature. The Defendant, on the other hand, suggests that this Court follow the decision by the District Court in *Olin* and dismiss the Plaintiff's claim under CERCLA. Since a conclusion either that CERCLA cannot be applied retroactively or that Congress exceeded the authority granted to it by the Commerce Clause when it enacted that statute would prevent the Court from holding the Defendant liable under that statute, the Court will resolve the two issues addressed in *Olin*, before turning to the merits of the Plaintiff's claim under CERCLA. As a means of analysis, the Court will initially discuss the question of whether CERCLA can be applied retroactively, following which it will discuss the constitutionality of that statute under the Commerce Clause.

Before engaging in that analysis, however, the Court believes that it must explain why it is appropriate to discuss the District Court's decision in *Olin*, even though that decision was subsequently reversed by the Eleventh Circuit. The parties filed their memoranda addressing that decision before the Eleventh Circuit issued its opinion. In its memorandum, the Defendant argued that this Court should follow the result reached by the District Court therein and, thus, that this Court should hold both that CERCLA cannot be applied retroactively and that the statute violates the Commerce Clause. Certainly, this Court cannot resolve the arguments raised by the Defendant herein without determining whether the District Court in *Olin* correctly decided those issues. Moreover, since the Sixth Circuit has not resolved the is-

sues of whether, in light of recent Supreme Court authority, CERCLA can be applied retroactively or was enacted in accordance with the authority granted to Congress by the Commerce Clause, issues which it may well consider on any appeal taken from this Decision, including a brief discussion of the *Olin* court's analysis, even though ultimately discredited by the Eleventh Circuit, will be instructive.

### 1. Retroactivity

█ In *Olin*, the District Court noted that all federal courts which had considered the question had concluded that CERCLA could be applied retroactively.[32] 927 F.Supp. at 1507. Nevertheless, the *Olin* court did not consider those decisions to be persuasive, because those decisions predated *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), which, according to the *Olin* court, "demolishe[d] the interpretive premises on which prior cases had concluded that CERCLA is retroactive." 927 F.Supp. at 1508. In *Landgraf*, the Supreme Court concluded that the Civil Rights Act of 1991 could not be applied retroactively (i.e., to conduct occurring before its effective date) and set forth the analytical framework which must be followed to determine whether a statute may be applied retroactively:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress

---

**32.** In *Olin*, the District Court addressed the issue of whether Congress intended that CERCLA be applied retroactively, rather than whether it was constitutionally permissible for Congress to do so. Similarly, the Defendant herein merely argues that Congress did not express an intent to make CERCLA retroactive. Therefore, if this Court concludes that Congress intended to make CERCLA retroac-

tive, the Court will not address the question of whether Congress acted constitutionally, by making CERCLA applicable to conduct that had occurred before its effective date. Simply stated, it would be inappropriate for this Court to raise, on its own motion, and to decide the issue of whether the Congress acted constitutionally by making CERCLA retroactive, an argument not raised herein.

has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

511 U.S. at 280, 114 S.Ct. 1483. When it enacted CERCLA, Congress did not expressly indicate that said statute was to be applied retroactively or that it was not to be so applied. Section 302(a) of CERCLA provides that "[u]nless otherwise provided, all provisions of this Act shall be effective on the date of the enactment of this Act." 94 Stat. 2767, 2808. In *Landgraf,* the Supreme Court concluded that a provision of the Civil Rights Act of 1991, which contained similar language, did not constitute such an express statement. *Id.* at 257–63, 114 S.Ct. 1483. *See also, Moore v. Califano,* 633 F.2d 727, 733 (6th Cir.1980) (notion that a statement in a statute that it shall take effect upon its enactment is inconclusive as to whether retroactive application was intended). To impose CERCLA liability upon the Defendant in this case would be to give "retroactive effect" to that statute. The GDA was closed in 1977; however, CERCLA did not become effective until December 11, 1980. In other words, the Plaintiff is seeking to impose liability upon the Defendant for conduct which did not violate CERCLA when the latter engaged in it, since that statute was not in effect when the Defendant so acted. *Landgraf,* 511 U.S. at 269–70, 114 S.Ct. 1483 (noting that a statute applies retroactively when it "attaches new legal consequences to events completed before its enactment"). Consequently, the Court must apply the presumption against retroactive application "absent clear congressional intent favoring such result." For reasons which follow, the Court concludes that both the text of CERCLA and its legislative history furnish such intent.

The first indication that Congress intended that CERCLA would be applied retroactively is the preamble to that statute, which provides that it is an act "[t]o provide for liability, compensation, cleanup and emergency responses for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." 94 Stat, 2767. It is not possible "[t]o provide for liability ... for ... the cleanup of inactive hazardous waste disposal sites" without applying CERCLA retroactively. A "cleanup" necessarily contemplates action on a site to remediate a condition already in existence. Therefore, if this Court did not so apply that statute, it would be required to deny one of the Congressionally declared purposes of that enactment. *Accord, Nova Chemicals, Inc. v. GAF Corp.,* 945 F.Supp. 1098 (E.D.Tenn.1996). The text of CERCLA also lends support to the conclusion that it is to be applied retroactively. For instance, § 107(a) of CERCLA, 42 U.S.C. § 9607(a), imposes liability upon responsible parties for three types of costs, to wit: removal and remedial actions, other necessary response costs and damages to natural resources. However, in § 107(f) of that statute, Congress expressly prohibited the imposition of liability for damages to natural resources "where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act." 94 Stat. 22767, 2783. If Congress had not intended that liability for the remaining costs, i.e., removal and remedial actions and for other response costs, to be imposed for conduct occurring before the effective date of CERCLA, it

would have not been necessary to create an exemption for liability for damage to natural resources based upon conduct occurring before that date. Several other courts have relied upon the negative implication of the exemption contained in § 107(f) in order to conclude that Congress clearly intended that CERCLA would be applied retroactively. *See e.g., Ninth Avenue Remedial Group v. Fiberbond Corp.*, 946 F.Supp. 651 (N.D.Ind. 1996); *State of Nevada ex rel. Dept. of Transportation v. United States*, 925 F.Supp. 691 (D.Nev.1996). In addition, § 107(a), which is the provision of CERCLA under which liability is imposed upon responsible parties, is phrased in the past tense. *See* 42 U.S.C. § 9607(a)(2) (imposing liability upon any person "who at the time of disposal of any hazardous substance owned or operated any facility into which hazardous substances were disposed of"); *id.* at § 9607(a)(3) (imposing liability upon any person who "arranged" for the transportation or disposal of any hazardous substances); *id.* at § 9607(a)(4) (imposing liability upon person who accepts or "accepted" hazardous waste for disposal). After *Landgraf,* other courts have found that the use of the past tense in this key provision of CERCLA demonstrates clear Congressional intent that such statute is to be applied retroactively. *See e.g., Ninth*

*Avenue,* 946 F.Supp. at 658. Additionally, the Eleventh Circuit, when it reversed the District Court's decision in *Olin,* noted that § 103(c) of CERCLA, 42 U.S.C. § 9603(c), required any person, who owned or operated a facility at the time when hazardous substances had been disposed of, to notify the EPA within 180 days of the effective date of CERCLA. The Eleventh Circuit concluded that § 103(c) addressed conduct that had occurred before the enactment of that statute and that, therefore, Congress had intended that statute to be applied retroactively. *United States v. Olin Corp.*, 107 F.3d 1506, 1513 (11th Cir.1997).

In addition to the text of CERCLA, its legislative history is indicative of clear Congressional intent that the statute should be applied retroactively. CERCLA was enacted to fill a gap left by the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.*, a statute, the purpose of which is to prevent future harm, rather than to remediate that which has occurred in the past.[33] *See* H. Rep. 96–1016, Part I, at 17, *reprinted in,* 1980 U.S.C.C.A.N. 6119, 6120. Rather than focusing on the future, CERCLA looks to the past. That statute addresses what the House Report called the "tragic consequences" of the "inactive hazardous waste site problem."[34] *Id.* To address

---

33. "RCRA is a sweeping statute intended to regulate solid waste from cradle to grave." *C & A Carbone, Inc. v. Town of Clarkstown, New York,* 511 U.S. 383, 408, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (O'Connor concurring). In *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996), a unanimous Supreme Court characterized RCRA as a comprehensive environmental statute which governs the treatment, storage and disposal of solid and hazardous wastes. Its primary purpose was to reduce the amount of such waste generated and to assure that such waste which is nonetheless generated is properly treated, stored and disposed of " 'so as to minimize the present and future threat to human health and the environ-

ment.' " *Id.* at 483, 116 S.Ct. 1251 (quoting 42 U.S.C. § 6902(b)). The *Meghrig* Court stated that, unlike CERCLA, "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.*

34. To support this statement, the House Report contains a non-exclusive listing of sites where the previous disposal of hazardous wastes was presently causing adverse health and environmental consequences (Love Canal in New York being, perhaps, the most infamous). *See* H. Rep. 96–1016, Part I, at 18–20, *reprinted in,* 1980 U.S.C.C.A.N. 6119, 6121–23.

that problem, CERCLA directs the Administrator of the EPA to take emergency actions with respect to such sites and creates a federal, strict liability cause of action "to enable the Administrator to pursue rapid recovery of costs incurred for the costs of such actions undertaken by him from the persons liable therefor and to induce such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites." *Id.* It is simply not possible to fulfill the second purpose identified by the House Report (i.e., allowing the government to recover the costs it has incurred to remediate inactive hazardous waste sites from the persons responsible), unless CERCLA is applied retroactively (i.e., to conduct which occurred before its effective date). *Accord, Olin,* 107 F.3d at 1513–14. In short, use of the term "inactive hazardous waste sites" presupposes a site which at a prior point in time, i.e., prior to the enactment of the legislation, was active by being utilized for disposal.

In sum, this Court agrees with the overwhelming majority of federal courts, including the Eleventh Circuit in *Olin,* which have concluded, both before and after *Landgraf,* that Congress clearly intended that CERCLA be applied so as to impose liability for conduct which occurred before December 11, 1980, the effective date of that statute. Accordingly, the Court holds that the Defendant can be liable herein, despite the fact that its actions, upon which liability would be predicated, occurred before CERCLA was enacted.[35]

### 2. Constitutionality of CERCLA

■ The District Court in *Olin,* relying upon *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), also concluded that CERCLA violates the Commerce Clause, Article I, § 8, Clause 3, of the United States Constitution. 927 F.Supp. at 1521–33. In *Lopez,* the Supreme Court concluded that, by enacting the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A),[36] Congress had exceeded the authority bestowed upon it by the Commerce Clause. The *Lopez* Court summarized the Supreme Court's Commerce Clause jurisprudence by restating the "three broad categories of activity that Congress may regulate under its commerce power:"

> First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce.

**35.** In *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1505–06 (6th Cir.1989), the Sixth Circuit concluded that a 1986 amendment to CERCLA, which permitted the government to recover prejudgment interest, could be applied retroactively. To reach that conclusion, the Sixth Circuit relied upon cases in which courts had concluded that CERCLA could be applied retroactively. Since the Sixth Circuit decided that case before the Supreme Court issued its opinion in *Landgraf,* this Court has not based its conclusion that CERCLA is to be applied to conduct that occurred before its effective date upon the Sixth Circuit's decision in *R.W. Meyer;* however, that case certainly lends support to the conclusion reached herein.

**36.** That statute made it a federal offense for anyone knowingly to possess a firearm at a place the individual knows or has reasonable cause to believe is a school zone. A school zone encompassed the grounds of any public or private school, as well as a perimeter of 1000 feet around those grounds.

*Id.* at 558–59, 115 S.Ct. 1624 (citations omitted). *See also, Hodel v. Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 276–77, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). After summarily concluding that the Gun–Free School Zones Act did not come within Congress' authority under either of the first two categories (514 U.S. at 559, 115 S.Ct. 1624), the *Lopez* Court turned to the third category of Congressional authority. The *Lopez* Court also held that the statute did not come within the third category of Congressional authority under the Commerce Clause, writing that "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." 514 U.S. at 567, 115 S.Ct. 1624. *See also Id.* at 580, 115 S.Ct. 1624 (Kennedy, J., concurring) ("unlike earlier cases to come before the Court here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus").

Herein, the Court need not consider whether CERCLA regulates the channels of interstate commerce, the instrumentalities of interstate commerce, or persons or things in interstate commerce. Rather, for reasons which follow, the Court concludes that CERCLA regulates activities that substantially affect interstate commerce. Before engaging in this analysis, the Court believes that it is appropriate to set forth certain principles which inform that analytical framework. In the context of a challenge to a statute on the basis that, by enacting it, Congress exceeded the powers granted to it by the Commerce Clause, the Supreme Court has said that "[i]t is established beyond peradventure that legislative Acts adjusting the burdens and benefits of economic life come to [a court] with a presumption of constitutionality...." *Hodel v. Indiana,* 452 U.S. 314, 323, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (citation and internal quotation marks omitted). In addition, the issue to resolve is whether Congress had a rational basis for believing that the activity regulated by CERCLA substantially affects interstate commerce. *United States v. McHenry,* 97 F.3d 125, 127 (6th Cir.1996). Lastly, in the wake of *Lopez,* the Sixth Circuit has sounded the cautionary note that "the history of Commerce Clause jurisprudence 'still counsels great restraint.'" *United States v. Wall,* 92 F.3d 1444, 1452 (6th Cir.1996) (quoting *Lopez,* 514 U.S. at 568, 115 S.Ct. 1624 (Kennedy, J., concurring)).

In *Olin,* the District Court concluded that the activity regulated by CERCLA did not substantially affect interstate commerce, because that statute did not regulate economic activity.[37] 927 F.Supp. at 1532. Rather, since the case before it was

---

**37.** In *Olin,* the District Court also held that CERCLA did not come within Congress' authority under the Commerce Clause, because that statute does not contain a jurisdictional element (a required factual finding), which would ensure, through a case-by-case analysis, that the activity regulated by that statute affects interstate commerce The *Olin* court read *Lopez* as imposing the requirement that statutes contain such an element. 927 F.Supp. at 1532. In *United States v. Wall,* 92 F.3d 1444 (6th Cir.1996), the Sixth Circuit concluded that, by enacting 18 U.S.C. § 1955, a statute which criminalizes illegal gambling operations of a certain size, Congress did not exceed its authority under the Commerce Clause. In its opinion in *Wall,* the Sixth Circuit disagreed. with *Olin* 's interpretation of *Lopez* to the effect that a jurisdictional element is a necessary predicate in order for a statute to survive a challenge under the Commerce Clause. 92 F.3d at 1449 n. 11. Indeed, § 1955, the statute which the Sixth Circuit found to be constitutional in *Wall,* does not contain such a jurisdictional element. Therefore, this Court concludes that Congress did not exceed its authority under the Commerce Clause when it enacted CERCLA, merely because that statute does not require the Court to make such a factual finding.

a proposed consent decree which would have provided for the remediation of a closed landfill, that court concluded that CERCLA related strictly to real estate, the regulation of which was traditionally left to the states. *Id.* at 1532–33. Like every court which has subsequently considered the question, this Court disagrees with the analysis employed and the conclusion reached by the District Court in *Olin.* *See e.g., United States v. NL Industries, Inc.*, 936 F.Supp. 545 (S.D.Ill.1996); *Nova Chemicals, supra; United States v. Alcan Aluminum Corp.*, 1996 WL 637559 (N.D.N.Y.1996). The fact that environmental legislation enacted by Congress impacts upon the use of land does not mean that said statute violates the Commerce Clause. In *Hodel v. Virginia Surface Mining & Reclamation Assn., supra,* the Supreme Court addressed a challenge to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.,* predicated upon the argument that the Commerce Clause did not authorize Congress to enact a statute, which the plaintiffs had argued essentially regulated the use of land. According to the plaintiffs, the regulation of land-use was a local activity, over which the states had authority. In rejecting that challenge, the Supreme Court wrote:

> [A]ppellees' contention is that the "rational basis" test should not apply in this case because the Act regulates land use, a local activity not affecting interstate commerce. But even assuming that appellees correctly characterize the land use regulated by the Act as a "local" activity, their argument is unpersuasive.

> The denomination of an activity as a "local" or "intrastate" activity does not resolve the question whether Congress may regulate it under the Commerce Clause. As previously noted, the commerce power "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States v. Wrightwood Dairy Co.*, 315 U.S. [110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942) ].

452 U.S. at 280–81, 101 S.Ct. 2352. Accordingly, the Court turns to the question of whether the disposal of hazardous substances affects interstate commerce.

An important purpose of CERCLA is to protect groundwater from contamination caused by inactive, hazardous waste sites. 42 U.S.C. § 9618 (high priority shall be given to cleaning up hazardous waste sites from which the release of hazardous substances has contaminated or threatens to contaminate groundwater). *See also,* H. Rep. 96–1016, Part I, at 18, *reprinted in,* 1980 U.S.C.C.A.N. 6119, 6122 (noting the harm that inactive landfills have caused to groundwater, rendering local water supplies unusable). The Supreme Court has recognized that groundwater is an article of interstate commerce. *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982).[38] *See also, Id.* at 954, 102 S.Ct. 3456 ("Ground water overdraft is a national problem and Congress has the power to deal with it on that scale."). Certainly, Congress could have rationally believed that the number of inactive waste sites, leaking hazardous substances into the groundwater, would affect the quality of a product that moved in interstate commerce. In addition, the Eleventh Circuit concluded that CERCLA regulates activity that substantially affects

---

**38.** In *Sporhase,* the Supreme Court applied the dormant Commerce Clause to invalidate a Nebraska statute which forbade the export of groundwater, which had been drawn from inside that state, to any state which did not allow the reciprocal exportation of same.

interstate commerce, since the growth of the chemical industry, coupled with the concomitant increased disposal of the waste that it generated, had caused significant harm to a number of interstate industries, such as agriculture and fishing. 107 F.3d at 1510–11.

Based upon the foregoing, the Court concludes that Congress did not exceed its power under the Commerce Clause when it enacted CERCLA.[39]

*B. Is the Plaintiff's Claim One for Contribution, under § 113(f), or is it Entitled to Maintain a Cost Recovery Action under § 107(a)?*

Having concluded that CERCLA may be applied retroactively and that Congress did not violate the Commerce Clause by enacting that statute, the Court now turns to the merits of the Plaintiff's claim under CERCLA. As is stated above, the Plaintiff brings its claim under both § 107(a) and § 113(f). Under § 107(a)(4)(B), a person incurring response costs may maintain an action against any

potentially responsible persons, to recover "any other necessary costs incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Under § 113(f)(1), any person may initiate an action seeking contribution "from any other person who is liable or potentially liable under section 107(a)." 42 U.S.C. § 9613(f)(1). Thus, the Plaintiff has two potential avenues of recovery from the Defendant, to wit: a cost recovery action under § 107(a) and an action for contribution under § 113(f).[40] The majority of courts which have considered the question, including the Sixth and all other Circuits, have concluded that a party, which is itself partially responsible for the condition of a hazardous waste site, cannot maintain a cost recovery action, under § 107(a), against another responsible party. *See Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344 (6th Cir.1998); *Pneumo Abex Corp. v. High Point, Thomasville and Denton R. Co.*, 142 F.3d 769 (4th Cir.), *cert. denied*, 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d

**39.** In *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Supreme Court applied *Lopez* and held that Congress had exceeded the authority granted to it by the Commerce Clause, when it enacted the civil remedy provision contained in the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981, because that statute did not regulate activities having a substantial relation to interstate commerce (i.e., activities which substantially affect such commerce). In particular, the Supreme Court noted that the VAWA regulated non-economic, violent crimes, matters which were local in nature, the regulation of which had been traditionally left to the states. *Id.* at 1754. *Morrison* fails to alter this Court's conclusion that Congress acted in accordance with its powers under the Commerce Clause when it enacted CERCLA, since that statute does not address the type of non-economic, violent crimes regulated by the VAWA.

**40.** The Plaintiff contends that it does not matter upon which of those provisions of CERC-

LA the Court relies, because the ultimate question is for what portion of the costs Plaintiff has expended and will expend in the future is the Defendant liable. Although this Court agrees with the Plaintiff as to the identity of the ultimate question, it deems it appropriate to decide whether the Plaintiff's claim arises under § 107(a) or § 113(f). If Plaintiff has a cost recovery rather than a contribution claim, the Court will allocate liability between the parties in the context of ruling upon the Defendant's counterclaim for contribution. If the opposite is true, then the Court will make the requisite allocation when ruling upon Plaintiff's claim for contribution, and the Defendant's Counterclaim will be moot. Moreover, the question of whether the Plaintiff's claim is under § 107(a) or § 113(f) will determine which party has the burden of proof in this litigation. The Sixth Circuit has held that a party asserting a claim for contribution under § 113(f) has the burden of establishing the equitable share of its opponent. *Centerior Service Co. v. Acme Scrap Iron & Metal*, 153 F.3d 344, 348 (6th Cir.1998).

330 (1998); *Sun Company, Inc. v. Browning–Ferris, Inc.,* 124 F.3d 1187 (10th Cir. 1997), *cert. denied,* 522 U.S. 1113, 118 S.Ct. 1045, 140 L.Ed.2d 110 (1998); *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298 (9th Cir.1997), *cert. denied,* 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc.,* 100 F.3d 792 (10th Cir.1996); *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11 th Cir.1996); *Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 934–35 (8th Cir.1995); *United States v. Colorado & Eastern R. Co.,* 50 F.3d 1530, 1536–38 (10th Cir.1995); *United Technologies v. Browning–Ferris Industries,* 33 F.3d 96 (1st Cir.1994), *cert. denied,* 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664 (5th Cir.1989); *SC Holdings, Inc. v. A.A.A. Realty Co.,* 935 F.Supp. 1354, 1362–1365 (D.N.J.1996) (and cases cited therein at 1362); *Dartron Corp. v. Uniroyal Chemical Co., Inc.,* 917 F.Supp. 1173, 1181–82 (N.D.Ohio 1996). *Contra Adhesives Research, Inc. v. American Inks & Coatings Corp.,* 931 F.Supp. 1231 (M.D.Pa.1996); *Charter Township of Oshtemo v. American Cyanamid Co.,* 910 F.Supp. 332 (W.D.Mich.1995).[41] Despite the explicit language of § 107(a)(4)(B), that a potentially responsible person is liable to "any other person," courts have concluded that only an innocent party (such as a person whose property is contaminated, without his permission, by the act of another) may maintain a cost recovery action under that provision.[42] *See e.g., Centerior,* 153 F.3d at 350; *Akzo Coatings,* 30 F.3d at 764. A number of reasons have supported the conclusion that one potentially responsible party cannot maintain a cost recovery action against another such party. For instance, to allow such an action would cause § 113(f) to be rendered meaningless and to be swallowed by § 107(a). *See e.g., Colorado & Eastern,* 50 F.3d at 1536; *United Technologies,* 33 F.3d at 101. Moreover, other provisions of CERCLA would be adversely affected by allowing such actions. Under § 113(f)(2), any person who has settled its liability with the EPA is not liable for contribution. That protection would be of small comfort if another potentially responsible party could maintain a cost recovery action against that settlor. Accordingly, the Court concludes that the Plaintiff's CERCLA claim is solely one for contribution, under § 113(f)(1) of that statute. As a consequence, the Defendant's counterclaim for contribution is moot.[43] In

**41.** In *Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), the Supreme Court noted that, before § 113(f) was added to CERCLA as part of the Superfund Amendments and Reauthorization Act of 1986, courts had concluded that there was an implied a right of action for contribution in favor of one potentially responsible party against another such party. *Id.* at 816, 114 S.Ct. 1960. The *Key Tronic* Court concluded that CERCLA "expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107." *Id.* The *Key Tronic* Court did not, however, hold that one potentially responsible person may bring a cost recovery action under § 107(a) (as opposed to one for contribution under § 113(f)),

against another such person. In *Centerior,* the Sixth Circuit distinguished *Key Tronic,* because the Supreme Court had not addressed the question of whether one potentially responsible person may maintain a cost recovery action against another such person. 153 F.3d at 355 n. 13.

**42.** None could argue that Plaintiff is an innocent party that has been forced to incur response costs.

**43.** In accordance with § 113(f)(1), the Defendant will not be required to contribute more than its equitable share of the total costs to remediate the GDA; therefore, it cannot maintain a claim against the Plaintiff, to recover that portion of those costs which exceed its fair share.

addition, the Plaintiff has the burden of establishing the Defendant's equitable share of the costs to clean up the GDA. *Centerior,* 153 F.3d at 348.[44]

## C. Is Defendant Liable under CERCLA?

■ Having concluded that the Plaintiff may only seek contribution, the Court turns to the question of whether the Defendant is liable for same. Section 113(f)(1), which statutorily creates the right of contribution, provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under section 106 or under section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107.

42 U.S.C. § 9613(f)(1). Thus, it can be seen that, even though the Plaintiff's claim is under § 113(f)(1), § 107(a) remains relevant, since a party can obtain contribution, under the former, only from a person who is liable under the latter. *See Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 653 (6th Cir.2000); *Centerior,* 153 F.3d at 350. Therefore, Plaintiff's initial burden is to establish that the Defendant is liable under § 107(a). In order to establish such liability, a plaintiff must establish the following elements by the preponderance of the evidence, to wit:[45] 1) that the defendant is within one of the four categories of potentially responsible parties set forth in § 107(a); 2) that the site is

---

**44.** Therefore, the Court rejects the Plaintiff's assertion (*see* Doc. # 184 at 51–53) that the Defendant has the burden of proof on the question of each party's equitable share of the total liability. Additionally, throughout its post-trial memoranda, the Plaintiff has suggested that Defendant is jointly and severally liable for the cost of cleaning up the GDA. If this litigation were a cost recovery action brought by the United States, this Court would agree; however, since this is not such a lawsuit, the Plaintiff and Defendant are not jointly and severally liable. Rather, each party is responsible for its equitable share of the entire liability, as determined by this Court in accordance with § 113(f). Courts have uniformly held that a potentially responsible party is jointly and severally liable with all other such parties in a cost recovery action brought by the United States, unless that potentially responsible party is able to prove that the harm it caused is divisible from that caused by the other potentially responsible parties. *See e.g., United States v. Township of Brighton,* 153 F.3d 307, 317–18 (6th Cir.1998); *Redwing,* 94 F.3d at 1513; *United States v. Alcan Aluminum Corp.,* 990 F.2d 711 (2nd Cir. 1993); *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497 (6th Cir.1989), *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). Herein, the evidence does not permit the Court to find that the harm caused by the parties is divisible. On the contrary, the hazardous substances contributed by each to the GDA have been commingled and released into the environment together. The molecules of benzo(a)pyrene that came from the Plaintiff's disposal of waste at the GDA are indistinguishable from those that originated with the waste dumped by the Defendant in that facility. However, the question of joint and several liability and divisibility of harm is academic in this litigation. Rather, when one potentially responsible party seeks contribution from another under § 113(f), the parties, rather than being jointly and severally liable, are responsible only for their own equitable shares. *Sun Company,* 124 F.3d at 1191; *Pinal Creek,* 118 F.3d at 1301; *Kalamazoo River Study Group v. Rockwell International,* 991 F.Supp. 890, 893 (W.D.Mich.1998).

**45.** Section 107(b) provides a number of defenses to an action under § 107(a); however, none of them is applicable in this litigation.

a "facility," as defined by § 101(9) of CERCLA, 42 U.S.C. § 9601(9); 3) that there has been a release or threatened release of hazardous substances at the "facility"; 4) that the plaintiff incurred necessary "response costs," responding to that release or threatened release; and 5) that the costs incurred are consistent with the NCP.[46] *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 602–03 (2nd Cir.1999); *Kalamazoo River Study Group v. Rockwell International*, 171 F.3d 1065, 1068 (6th Cir. 1999); *Centerior*, 153 F.3d at 347–48.

The Court need not devote a significant amount of time to the first four elements set forth above. The evidence, including the facts to which the parties have stipulated in the Final Pretrial Order, establish those elements.[47] *First*, § 107(a)(3) provides, *inter alia*, that any person who has arranged for the disposal of hazardous substances at any facility is liable under CERCLA. The Court has found, above, that Defendant Amcast arranged for the disposal of hazardous substances, including the carcinogenic PAH, benzo(a)pyrene, at the GDA, and is, therefore, a potentially responsible party.[48] *Second*, § 101(9) of CERCLA, 42 U.S.C. § 9601(9), defines the term "facility" broadly to include any landfill or area into which hazardous substances have been disposed. In the Final Pretrial Order, the parties agreed that the GDA is such a facility, as defined by § 101(9). *Third*, the term "release" is defined by § 101(22) to include any escaping or leaching into the environment. 42 U.S.C. § 9601(22). Section 101(8) of CERCLA defines the environment to in-

clude groundwater. 42 U.S.C. § 9601(8). The Court has found that the carcinogenic PAH benzo(a)pyrene and other hazardous substances migrated from the GDA, where the parties had disposed of them, to the groundwater that lies below that facility. Thus, there has been a release of hazardous substances from the GDA.

*Fourth*, although the term "response costs" is not defined by CERCLA, the words "respond" and "response" are defined as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). Those terms are defined by the preceding subsections:

> (23) The terms "remove" or "removal" means (sic) the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken un-

---

**46.** The requirement of consistency with the NCP is derived from § 107(a)(4)(B), which authorizes a private party to recover its response costs which have been incurred "consistent with the national contingency plan."

**47.** Indeed, the Defendant has not argued that the Plaintiff has failed to prove any of those four elements.

**48.** The parties have stipulated that the waste which Defendant disposed of at the GDA contained hazardous substances, including the carcinogenic PAH, benzo(a)pyrene. Indeed, the EPA has designated that compound as a hazardous substance under CERCLA. 40 C.F.R. § 302.4 at Table 302.4.

der section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act.

(24) The terms "remedy" or "remedial action" means (sic) those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(23) and (24). This Court has found, above, that the Plaintiff incurred response costs under CERCLA. The RI/FS and the study of the NAPS layer qualify as removal actions, which are defined to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." In addition, implementing the remedy adopted by the EPA in the ROD, by conducting the RD/RA, which included developing plans for the implementation of the chosen remedy and executing same, comes within the definition of remedial action, which includes activities such as covers for a hazardous waste site and treatment of hazardous wastes.[49]

The remaining element is whether the Plaintiff has incurred those response costs in a manner that is consistent with the NCP.[50] The Court engages in a two-step analysis of this issue, initially determining which version of the NCP is applicable (at least with regard to the question of how a court should determine whether the response costs were incurred in a manner that complies with the NCP) and, then, deciding whether the Plaintiff has met the requirements of the NCP. As a means of analysis, the Court will address those two issues in the above order.

**49.** Of course, the Plaintiff may only recover "necessary" response costs. Given that the Plaintiff has incurred response costs in order to comply with two orders issued by the EPA, the Court finds that those costs were necessary. The Defendant has not argued that the Plaintiff's response costs were other than necessary.

**50.** In the regulations, the NCP is more formally referred to as the "National Oil and Hazardous Substances Contingency Plan." See 40 C.F.R. Part 300.

■ The NCP "is a series of regulations promulgated by the Environmental Protection Agency. The regulations establish criteria and provide guidance for site evaluation and cost effectiveness, planning of cleanup actions, and consideration of alternative remedial options." *Pierson Sand & Gravel, Inc. v. Pierson Tp.*, 851 F.Supp. 850, 855–56 (W.D.Mich.1994), *affirmed*, 1996 WL 338624 (6th Cir.1996). The NCP, which has been promulgated pursuant to 42 U.S.C. § 9605(a), is set forth at 40 C.F.R. Part 300. Three versions of the NCP have been in effect during the time that Plaintiff incurred its response costs. In April, 1984, when the Plaintiff entered into an Administrative Consent Order with the EPA, under which it agreed to conduct an RI/FS at its expense, the 1982 version of the NCP was in effect. Effective February 18, 1986, the EPA revised and amended the NCP, adopting the 1986 version.[51] *See* 50 F.R. 47912. After the Plaintiff had completed the RI/FS and had begun the study of the NAPS layer and the RD/RA, the EPA, in 1990, once again amended and revised the NCP. *See* 55 F.R. 8666.

Of particular present importance is the different manner in which those three versions have addressed the issue of participation by private parties in the cleanup of hazardous waste sites and the question of under what circumstances such participation will be deemed to be consistent with the NCP. The second question is important, because, as is explained below, the 1990 version of the NCP expressly sets forth the standards which are to be applied to ascertain whether a private party's response costs were incurred in a manner that was consistent with the NCP, while the earlier versions were silent on that point.[52] The 1982 version of the NCP merely encouraged the participation of private parties in response actions. *See* 40 C.F.R. § 300.25 (1983). That version did not address the question of under what circumstances such participation would be deemed to be consistent with the NCP. The 1986 version of the NCP contained a similar provision encouraging such participation. *See* 40 C.F.R. § 300.25 (1987). In addition, a provision of the 1986 incarnation, § 300.71, provides, in pertinent part:

*Section 300.71: Other party responses*

(a)(1) Any person may undertake a response action to reduce or eliminate the release or threat of release of hazardous substances, or pollutants or contaminants. Section 107 of CERCLA authorizes persons to recover certain response costs consistent with this Plan from responsible parties.

(a)(2) For purposes of cost recovery under section 107 of CERCLA, except for actions taken pursuant to section 106 of CERCLA or pursuant to preauthorization under § 300.25 of this Plan, a response action will be consistent with the NCP (or for a State or Federal government response, not inconsistent with the NCP), if the person taking the response action:

---

**51.** The 1986 version of the NCP was promulgated in 1985, and became effective in 1986. Although some courts have referred to that regulation as the 1985 version of the NCP (*see Washington State DOT v. Natural Gas Co.*, 59 F.3d 793 (9th Cir.1995)), the parties herein have called that regulation the 1986 version, since that is the year in which it became effective. To be consistent with the parties' designation, this Court will do likewise.

**52.** The parties agree that the actual, substantive requirements of the NCP are those that were in effect when the Plaintiff took a particular action. They do disagree, however, over which version of the NCP supplies the standard (substantial or strict compliance) which must be employed to ascertain whether the Plaintiff has met the actual, substantive requirements of the applicable NCP.

(a)(2)(I) Where the action is a removal action, acts in circumstances warranting removal and implements removal action consistent with § 300.65.

(a)(2)(ii) Where the action is a remedial action:

(a)(2)(ii)(A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;

(a)(2)(ii)(B) Complies with the provisions of paragraphs (e) through (I) of § 300.68;

(a)(2)(ii)(C) Selects a cost-effective response; and

(a)(2)(ii)(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the legally applicable or relevant and appropriate State and local requirements identified under paragraph (4) of this section provides a substantially equivalent opportunity for public involvement in the choice of remedy.

(a)(3) For the purpose of consistency with § 300.65 and § 300.68 of this Plan, except for response actions taken pursuant to section 106 of CERCLA or response actions for which reimbursement from the Fund will be sought, any action to be taken by the "lead agency" in § 300.65 or § 300.68 may be taken by the person carrying out the response.

(a)(4) Persons performing response actions that are neither Fund-financed nor pursuant to action under section 106 of CERCLA shall comply with all otherwise legally applicable or relevant and appropriate Federal, State, and local requirements, including permit requirements.

40 C.F.R. § 300.71. Courts were split over the question of whether that language re-

quired a party, seeking to recover a portion of its response costs, to prove that it had strictly complied with the NCP or whether substantial compliance was sufficient. *See e.g., Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1576 (9th Cir.1994) (only substantial compliance is necessary for response costs incurred prior to 1990), *cert. denied,* 513 U.S. 1103, 115 S.Ct. 780, 130 L.Ed.2d 674 (1995); *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1513–14 (10th Cir.1991) (applying a strict compliance standard).

In 1990, the EPA resolved the issue of whether strict or substantial compliance is required by expressly opting for substantial compliance in § 300.700, which provides in pertinent part: [53]

*Section 300.700: Activities by other persons*

(a) General. Except as provided (e.g., in CWA section 311(c)), any person may undertake a response action to reduce or eliminate a release of a hazardous substance, pollutant, or contaminant.

(b) Summary of CERCLA authorities. The mechanisms available to recover the costs of response actions under CERCLA are, in summary:

(1) Section 107(a), wherein any person may receive a court award of his or her response costs, plus interest, from the party or parties found to be liable;

\* \* \* \* \* \*

(c) Section 107(a) cost recovery actions.

\* \* \* \* \* \*

■■■ (2) Responsible parties shall be liable for necessary costs of response actions to releases of hazardous substances incurred by any other person consistent with the NCP.

---

**53.** The 1990 version of the NCP also contains a provision, similar to § 300.25 of the 1982 version, which encourages private parties to participate in response actions. 40 C.F.R. § 300.185.

(3) For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA:

(I) *A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup;* and

(ii) Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered "consistent with the NCP."

40 C.F.R. § 300.700 (1991) (emphasis added).[54] Herein, the Plaintiff undertook the actions, for which it seeks contribution from the Defendant, throughout a period of time during which all three versions of the NCP have been in effect.[55] Courts have concluded that the 1990 version of the NCP is applicable in lawsuits where response actions, although begun before that regulation became effective, continued after that date. *See e.g., American Color & Chemical Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945, 956 (D.S.C.1995); *Jastram v. Phillips Petroleum Co.,* 844 F.Supp. 1139, 1142–43 (E.D.La.1994); *Sherwin–Williams v. City of Hamtramck,* 840 F.Supp. 470, 476 (E.D.Mich.1993); *Tri–County Business Campus v. Clow Corp.,* 792 F.Supp. 984, 990 (E.D.Pa.1992).

In other words, whether the Plaintiff has incurred response costs, that are "consistent with the national contingency plan" (42 U.S.C. § 9607(a)(4)(B)), is to be judged in accordance with the standards for assessing same that are set forth in § 300.700(c)(3). This Court agrees with the result reached in those cases. Indeed, the EPA expressly indicated that the 1990 version of the NCP should be applied to cleanup actions which were underway on the effective date of that regulation. *See* 55 F.R. 8666, 8795. Accordingly, the question of the Plaintiff's compliance with the NCP will determined in accordance with the standards for judging same, as contained in 1990 version of the NCP, in particular § 300.700(c)(3).[56]

As an initial matter, the Court notes that § 300.700(c)(3)(ii) provides that any response action carried out in compliance with the terms of an order, issued by the EPA pursuant to § 106 of CERCLA, are considered to be "consistent with the NCP." Thus, response actions taken pursuant to such an order are consistent with the NCP, if those actions were in compliance with that order. *See Bancamerica Commercial v. Mosher Steel of Kansas,* 100 F.3d 792, *amended,* 103 F.3d 80 (10th Cir.1996); *Browning–Ferris Industries of Ill. v. Ter Maat,* 13 F.Supp.2d 756, 769 (N.D.Ill.1998) (and cases cited therein). In *Browning–Ferris,* the court indicated that, pursuant to the § 300.700(c)(3)(ii), compliance with a § 106 order creates an irre-

---

**54.** In 1994, the EPA amended the NCP once again. Those amendments were adopted in order to bring that regulation into conformity with the Oil Pollution Act of 1990, P.L. 101–380, 104 Stat. 484. *See* 59 F.R. 47384. That statute, which was passed in the wake of the Exxon Valdez disaster, addresses, *inter alia,* responses to oil spills. The 1994 amendments to the NCP did not alter the quoted provision from the 1990 version.

**55.** It bears emphasis that the parties agree that the actual, substantive requirements of the NCP are those that were in effect when the Plaintiff took a particular action. Their area of disagreement is over which version of the NCP supplies the standard which must be employed to determine whether the Plaintiff has met the actual, substantive requirements of the NCP.

**56.** In its Decision of February 3, 1995 (Doc. # 148), this Court concluded that substantial, rather than strict, compliance was the appropriate standard.

buttable presumption of consistency with the NCP. *Id.* Herein, the Plaintiff incurred all response costs at issue in this litigation as a result of having entered into two consent orders with the EPA, one of which required Plaintiff to conduct the RI/FS, while the other required it to implement the remedy selected in the ROD and to study the NAPS layer. The Plaintiff retained a contractor, IT Technology Corporation ("IT"),[57] to perform the RI/FS, and the EPA and OEPA retained Metcalf & Eddy, a highly regarded environmental consulting firm, to supervise the work of IT.[58] Of course, both the EPA and the OEPA had their own project managers and staffs involved in the project. The evidence presented establishes that the Plaintiff did not merely engage in the activities, which caused it to incur response costs, and, then, obtain some sort of rubber stamp approval from the federal and state regulatory agencies. On the contrary, the Plaintiff conducted those activities under the close direction and supervision of the EPA and the OEPA. Before the RI/FS could begin, IT and Plaintiff were required to prepare a work plan. A draft copy of that document was submitted to the regulatory agencies and their consultant for their review and approval.[59] That process resulted in meetings and discussions among the Plaintiff, IT, the regulatory agencies and Metcalf & Eddy, before a final version of that plan was approved.

Similarly, drafts of both phases of the Remedial Investigation, the Feasibility Study and the study of the NAPS layer were submitted to the EPA, OEPA and Metcalf & Eddy for review and comment. This process not only involved the submission of drafts and the receipt of comments, but also meetings between the individuals supervising the project, during which the comments by the agencies and their contractor would be discussed. In addition, the regulatory agencies have exercised the same strict direction and supervision of the Plaintiff and its contractor with respect to the RD/RA process, which has involved the submission and approval of detailed engineering and construction documents and, then, the implementation of the plans contained in those documents. The Plaintiff and its contractor did not take any action with respect to the cleanup of the GDA, without the approval of the EPA.

In sum, based upon the close direction and supervision by the EPA and the OEPA, assisted by Metcalf & Eddy, of every step taken by the Plaintiff and its contractor, IT, the Court finds that the Plaintiff incurred response costs while engaging in activities that were in compliance with the terms of orders, issued by the EPA pursuant to § 106 of CERCLA.[60] As a consequence, the Plaintiff has incurred those response costs in compliance with the NCP. 40 C.F.R. § 300.700(c)(3)(ii).[61]

57. Initially, Plaintiff retained D'Appolonia Waste Management as its contractor. However, after that work had commenced, IT acquired D'Appolonia's environmental business. IT then became the Plaintiff's contractor. For sake of convenience, the Court refers to Plaintiff's contractor as IT.

58. Whenever Plaintiff or IT submitted a document to the regulatory agencies, a copy would be provided to Metcalf & Eddy for its review and comments, which, in turn, would be provided to Plaintiff and IT.

59. The Plaintiff was also required to obtain approval from the EPA of work plans for the

Feasibility Study and the RD/RA, before commencing those tasks. To obtain that approval, the Plaintiff submitted drafts to and received comments from the EPA.

60. Indeed, the EPA found in the ROD that the Plaintiff had performed the RI/FS in compliance with the NCP. *See* Plaintiff's Exhibit 39 at 7.

61. The Defendant argues that approval by the EPA of the actions taken by the Plaintiff does not necessarily mean that it has complied with the NCP, because courts have refused to rubber-stamp decisions by the EPA in cases

■ However, even if the Court did not rely upon § 300.700(c)(3)(ii), it would conclude that the Plaintiff has incurred response costs that are consistent with the NCP, because the Plaintiff, at a minimum, substantially complied with that regulation.[62] The Defendant argues that the Plaintiff was deficient in three regards, in that it: 1) failed to identify all potentially responsible parties (i.e., all other entities that dumped waste into the GDA); 2) failed to perform an adequate analysis of the wastes which had been disposed of at the GDA; and 3) failed to consider all alternative methods of remedying the GDA.[63] The Court will address these alleged shortcomings in the above order. However, before engaging in that analysis,

it should be noted that the Defendant does not argue that the remedy selected by the EPA in the ROD will not result in a "CERCLA-quality cleanup." *See* 40 C.F.R. § 300.700(c)(3)(I). On the contrary, John Mundell, an expert witness retained by the Defendant for this and other CERCLA litigation in which it is involved, conceded that the remedy selected by the EPA is protective of health and the environment and that it is cost-effective. VI Transcript (Doc. # 166) at 18–22.

*First,* the Defendant argues that the Plaintiff failed to identify all potentially responsible parties involved with the GDA. In particular, the Defendant relies upon the fact that, in the Remedial Investiga-

arising under CERCLA. In support of that argument, the Defendant relies upon *In re Bell Petroleum Services, Inc.,* 3 F.3d 889 (5th Cir.1993). Therein, the EPA sought to recover the response costs it had incurred to construct a pipeline which would provide an alternative source of water. The Fifth Circuit concluded that the EPA was not entitled to recover those costs, because the EPA had selected a remedy that did not comply with the NCP. Rather, the Fifth Circuit concluded that the selection of the alternative water supply remedy had been arbitrary and capricious, since there was not a shred of evidence that anyone served by that alternative water supply had been drinking contaminated water. On the contrary, the only contaminated wells in the area had been utilized by commercial establishments which were prohibited from connecting to the alternative water supply. Herein, by contrast, there was no evidence that the approval by the EPA of the actions taken by the Plaintiff was in any manner arbitrary and capricious. Indeed, the Defendant does not argue that the EPA acted in such a manner. Accordingly, *Bell Petroleum* fails to support the Defendant's contention that EPA approval of the Plaintiff's actions does not establish, in and of itself, compliance with the NCP.

62. The phrase "substantial compliance" is not defined by the NCP. Courts applying that concept in CERCLA cases have also failed to give it express meaning. The Sixth Circuit has indicated that a fiduciary is in substantial

compliance with a provision contained in the Employee Retirement Income Security Act, 29 U.S.C. § 1133, under which the fiduciary is required to include certain information in its decision to reject a claim, if its communication to the claimant meets the purpose of the statute, even though it may be technically deficient. *Kent v. United Omaha Life Ins. Co.,* 96 F.3d 803, 807 (6th Cir.1996). Applying that concept, an entity substantially complies with the NCP, when its actions meet the purposes of that regulation, even though they contain deviations which are technical or immaterial.

63. The Defendant also states that the Plaintiff did not comply with the NCP, because it failed to document all of its actions. Since the Defendant has not developed that assertion in its post-trial memoranda, the Court does not address it, other than to state that there was overwhelming evidence of documentation by the Plaintiff of the actions it took. Assuming, *arguendo,* that the Plaintiff failed to keep a record of some of its actions, the Court nevertheless finds that the Plaintiff has substantially complied with the NCP. Moreover, in support of that argument, the Defendant relies upon provisions in the 1982 and 1986 NCP, 40 C.F.R. § 300.69, which only apply to actions taken by the government, and not those undertaken by a private party.

tion, the Plaintiff did not identify Ford Brothers Company and the Goldcamps, as contributors of waste to the GDA.[64] Although there was no evidence as to the wastes that the Goldcamps disposed of at the site, there was testimony that Ford Brothers Company would occasionally rinse out tanker trucks in the GDA, thus disposing of oil and gasoline in that facility. *See* I Transcript (Doc. # 162) at 203–04. In addition, the Plaintiff occasionally disposed of waste from its coke plant in the GDA.[65] Although the wastes from the Goldcamps, Ford Brothers Company and the Plaintiff's coke plant were not discussed in the Remedial Investigation, that fact does not cause the Court to find that the Plaintiff has failed to comply with the NCP. As an initial matter, the Defendant relies upon a provision in the NCP (40 C.F.R. § 300.69 (1986)) which imposes upon governmental entities, rather than on private parties such as Plaintiff, the responsibility of identifying potentially responsible parties. However, even assuming that the Plaintiff was obligated to identify all potentially responsible parties, the failure to identify the Goldcamps and Ford Brothers Company does not affect this Court's finding that the Plaintiff conducted its activities in substantial compliance with the NCP. There is no evidence that the failure to identify those potentially responsible parties has in any way affected the remedy chosen to remediate the GDA. On the contrary, that remedy is being driven by the presence of carcinogenic PAHs which have been released to the groundwater below that facility. Those hazardous substances originated primarily with the waste disposed of by Plaintiff at the GDA. The fact that the Plaintiff's waste had a high content of carcinogenic PAHs was known before the RI/FS commenced.

*Second*, the Defendant argues that the Plaintiff failed to perform an adequate analysis of the wastes contained in the GDA and, therefore, did not comply with the NCP. In particular, the Defendant contends that the Plaintiff's non-compliance is demonstrated by the failure to drill test wells inside the pit where the carcinogenic PAHs were located. In addition, the Defendant points to the fact that James Reid, a former employee of Plaintiff who continues to live in the Ironton area and who has a great deal of knowledge concerning the waste disposed of by Plaintiff into the GDA, was not interviewed until after the RI/FS had been completed. Defendant also mentions the fact that the Plaintiff did not even discover that its (Defendant's) foundry wastes contained carcinogenic PAHs until after the Remedial Investigation had been completed. The Court finds that, even if the foregoing demonstrates that the Plaintiff was somehow deficient in its analysis of the waste contained in the GDA, the Plaintiff, nevertheless, substantially complied with the NCP. The test wells were drilled in locations in accordance with a sampling plan that was approved by the EPA. Those wells were not drilled inside the pit of the GDA, into

---

64. The Defendant also cites Alpha Portland Cement ("Alpha"), as a potentially responsible party that Plaintiff failed to identify. The evidence of record does not convince the Court that Alpha disposed of waste at the GDA. The only evidence on that point was the testimony of Gary Neal, a former employee of Plaintiff, who merely indicated that it was possible that Alpha had disposed of waste at the site. I Transcript (Doc. # 162) at 180. In addition, Defendant cites waste disposed of by

some of Plaintiff's employees. That waste was described as garbage, and not chemicals that could cause environmental harm. *Id.* at 189. Consequently, the Court does not consider the failure of the Plaintiff to investigate the disposal of waste by its employees to be indicative of non-compliance with the NCP.

65. Most of the waste which Plaintiff deposited into the GDA originated at its coal tar plant, rather than originating in its coke plant.

which the hazardous substances had been deposited, because it was already known that the pit was a source of contamination. Moreover, there is no question that the sampling plan allowed those conducting the Remedial Investigation to discover the presence of carcinogenic PAHs in the groundwater below the GDA. Again, it bears emphasis that carcinogenic PAHs are driving the cleanup of the GDA. In addition, while Reid was not interviewed until after the completion of the RI/FS, documents that he had previously prepared, concerning the waste that both the Plaintiff and the Defendant had disposed of in the GDA, were reviewed and utilized during the Remedial Investigation. With respect to the failure to discover that the Defendant's foundry wastes contained carcinogenic PAHs until after the Remedial Investigation had been completed, such fact does not alter the conclusion that Plaintiff's wastes contained the identical chemical substances as Defendant's and that those substances, regardless of by which entity they were deposited into the GDA, were identified during that investigation.

*Third,* in a footnote to its Post-trial Brief, Defendant also cites the requirement in the NCP that the Plaintiff develop a list of cleanup methods and select the best, most cost-effective alternative. Doc. # 178 at 30 n. 23. According to the Defendant, Plaintiff failed to document properly "a complete consideration of the remedial alternatives (if such consideration was had at all), along with the rationale for rejecting certain alternatives." *Id.* The Court cannot agree with the Defendant that the Plaintiff failed to consider all remedial alternatives. The Defendant bases that assertion upon the testimony of Mundell.

That individual did testify that during the feasibility study, the Plaintiff had failed to consider several specific alternative remedies, without elaborating upon them. VI Transcript (Doc. # 166) at 143–44. In Defendant's Exhibit 630, which Mundell had prepared, he lists the alternatives which the Plaintiff allegedly failed to consider, to wit: waste flushing, hydraulic control without a slurry wall, bioremediation (also called biofarming) and solidification/stabilization. Mundell's testimony to the contrary notwithstanding, the Plaintiff did consider each of these alternative remedies. Waste flushing is a process by which water or a solvent would be pumped into the waste at the GDA and then extracted from that waste site along with the hazardous chemicals contained therein, thus flushing out those substances. The EPA directed the Plaintiff to delete that possible remedy from consideration. *See* Plaintiff's Exhibit 36. Hydraulic control without a slurry wall is discussed and rejected in the final draft of the Feasibility Study, as is solidification/stabilization. *See* Plaintiff's Exhibit 39 at 3–6, 2–17. Bioremediation is also discussed and rejected as a possible remedy in the final draft of the Feasibility Study.[66] *Id.* at 2–21.

In sum, the Court concludes that the Plaintiff has incurred response costs in a manner that is consistent with the NCP. Accordingly, the Court concludes that Defendant is liable under § 107(a).

## D. Equitable Allocation

Having concluded that the Defendant is liable under CERCLA, the Court now turns to the issue of equitable allocation, pursuant to § 113(f)(1), of the response costs that the Plaintiff has incurred. The

---

**66.** Bioremediation is a process by which microorganisms are added to a hazardous waste site to allow bioactivity to degrade the contaminants contained therein. That was not a feasible alternative remedy for the GDA, because it was too compacted and contained creosote which would have killed the microorganisms.

Plaintiff argues that the Court should allocate a "substantial" share of the response costs to the Defendant,[67] while the latter asserts that it should be held liable for no more than 1% of those costs. The Court begins that analysis by examining the factors that courts have considered, when making such an allocation.

Section 113(f)(1) provides that, in resolving contribution claims, "the court may allocate response costs among liable parties using such equitable factors as the court determines appropriate." 42 U.S.C. § 9613(f)(1). In *United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir.1991), the Sixth Circuit indicated that § 113(f)(1) invests District Courts with broad discretion to "construct a flexible decree balancing the equities in light of the totality of the circumstances." *Id.* at 572. *See also, Colorado & Eastern*, 50 F.3d at 1536 ("a court may consider several factors, a few factors, or only one determining factor, ... depending upon the totality of the circumstances presented to the court.") (citation and internal quotation marks omitted). The Sixth Circuit's interpretation of § 113(f)(1) is supported by its legislative history, which indicates that "courts are to resolve claims for apportionment on a case-by-case basis pursuant to Federal common law, taking all relevant equitable considerations into account" and that "courts may consider any criteria relevant to determining whether there should be an apportionment." H.R.Rep. No. 253(III), 99th Cong., 2nd Sess. 18–19, *reprinted in,* 1986 U.S.C.C.A.N. 3038, 3041–42. Of course, that discretion is not without limit, since a District Court may not require any party to contribute more than its equitable share of the entire cleanup costs. *Meyer*, 932 F.2d at 577–78 (Guy, J., concurring) (citing *United States v. Monsanto Co.*, 858

F.2d 160, 173 n. 29 (4th Cir.1988)). Courts have frequently noted that some or all of the so-called "Gore factors" [68] may be employed when exercising the broad discretion with which they are invested to make an equitable apportionment under § 113(f)(1). *See e.g., Control Data,* 53 F.3d at 935; *Colorado & Eastern,* 50 F.3d at 1536 n. 5; *R.W. Meyer,* 932 F.2d at 571; *Kerr–McGee Chemical v. Lefton Iron & Metal,* 14 F.3d 321, 326 (7th Cir.1994); *Kalamazoo River Group v. Rockwell International,* 107 F.Supp.2d 817, 822 (W.D.Mich.2000); *United States v. Davis,* 31 F.Supp.2d 45, 63 (D.R.I.1998) (and cases cited therein). *See also,* H.R.Rep. No. 253(III), 99th Cong., 2nd Sess. 19, *reprinted in,* 1986 U.S.C.C.A.N. 3038, 3042 (listing the Gore factors as criteria a court may consider when making an apportionment). The Gore factors are:

1. the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;

2. the amount of hazardous waste involved;

3. the degree of toxicity of the hazardous waste;

4. the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

5. the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

6. the degree of cooperation by the parties with Federal, State, or local offi-

---

67. The Plaintiff has not explained what it means by "substantial."

68. The Gore factors are named for then Congressman Albert Gore, Jr., one of the sponsors of CERCLA.

cials to prevent any harm to the public health or the environment.

*Control Data,* 53 F.3d at 935. *See also, R.W. Meyer,* 932 F.2d at 571.[69]

For reasons that follow, this Court finds that, applying its broad discretion to the totality of the circumstances giving rise to the need to remediate the GDA, the Defendant should be required to pay for 2% of the response costs incurred by the Plaintiff, with the exception of those costs associated with the cap for that facility. With respect to the cap, the Court finds that the Defendant is responsible for 28% of the costs incurred by the Plaintiff. As a means of analysis, the Court will initially set forth its reasons for finding that the Defendant is liable for 2% of the Plaintiff's response costs for all items with the exception of the cap, following which it will set forth its reasoning relating to the cap.

### 1. Plaintiff's Response Costs for Items Other than the Cap

 Excluding the cap, the Plaintiff has incurred response costs to conduct the RI/FS, to study the NAPS layer and to execute the remedy selected by the EPA in the ROD, by engaging in the RD/RA. The environmental risk posed by the GDA is one to the groundwater in the aquifer below it. Some of the carcinogenic PAHs disposed of in the GDA, typified by benzo(a)pyrene, have migrated to and contaminated the groundwater. Indeed, the NAPS layer is composed of PAHs, including the carcinogenic variety. The remedy selected by the EPA included the construction of the slurry wall and the pumping and treating of the contaminated groundwater, both within and outside the slurry wall. The slurry wall will prevent the further spread of carcinogenic PAHs, while the "pump and treat" component of the remedy will, over time, remove those hazardous substances from the groundwater.[70] Thus, the evidence presented at tri-

**69.** Throughout its Post-trial Memorandum (Doc. # 178), Defendant cites § 433A of the Restatement, Second, of Torts, as a framework to employ to determine its equitable share of the Plaintiff's response costs. This Court does not agree. In a cost recovery action by the government, a responsible party is jointly and severally liable, unless able to prove that the environmental harm that it caused is divisible. *See e.g., Township of Brighton,* 153 F.3d at 317–18. In such cases, courts have employed § 433A, which addresses the question of apportionment of damages for harm from two causes, to determine whether the environmental harm is divisible and, therefore, whether the imposition of joint and several liability is inappropriate. *See e.g., Id.* Herein, the Court is required to allocate the Plaintiff's response costs for an indivisible environmental harm caused to the area surrounding the GDA. Divisibility of harm is not a defense to a contribution action. *Redwing Carriers,* 94 F.3d at 1513–14. *See also,* Footnote 43, *supra.* Consequently, this Court does not employ § 433A as a framework by which to allocate the Plaintiff's response costs. The rejection of § 433A as the basis for apportioning the parties' responsibility does not mean that the Court will fail to consider the parties' ability to demonstrate that their contribution to a discharge, release,

or disposal of a hazardous waste can be distinguished, i.e., the first Gore factor. However, in considering that factor, the Court will do so in the context of employing equitable factors to ascertain each party's fair share. In *Township of Brighton,* the Sixth Circuit rejected the argument that equitable factors should be employed to ascertain whether the environmental harm was divisible, thus relieving the defendant of joint and several liability in a cost recovery action brought by the Government, writing:

> Although we know that we cannot define for all time what is a reasonable basis for divisibility and what is not, we do take this opportunity to reject fairness-based approaches in favor of the more precise and less normative Restatement approach, which concentrates solely on causation. We distinguish the divisibility defense to joint and several liability from the equitable allocation principles available to defendants under CERCLA's contribution provision. The former is legal, the latter equitable; the respective tests used to execute them should reflect this distinction.

153 F.3d at 319 (footnote omitted).

**70.** That component of the remedy will continue for a number of years, thus giving rise to

al points to the inescapable conclusion that the remedy at the GDA is being driven by the presence of carcinogenic PAHs, typified by benzo(a)pyrene, in the groundwater below that hazardous waste site.[71] The remedy sets cleanup standards for six hazardous substances, in addition to benzo(a)pyrene;[72] however, since that chemical must be reduced to 0.005 parts per billion, which is a factor of reduction 1000 times greater than that for any other chemical, one can readily understand the Court's conclusion that the remedy is being driven by the presence of carcinogenic PAHs. Indeed, expert witnesses who testified on behalf of both the Plaintiff, Dr. Joseph Bern ("Bern"), and on behalf of the Defendant, Dr. Robert Ham ("Ham"), agreed that the remedy, at least with re-spect to the groundwater, is being driven by the presence of carcinogenic PAHs.

Before attempting to allocate the Plaintiff's response costs, the Court must first address the Defendant's argument that the Plaintiff is not entitled to recover any portion of the response costs it has incurred to study the NAPS layer and to construct the slurry wall. According to the Defendant, the need to conduct such a study was caused solely by the waste disposed of by the Plaintiff at the GDA. The Court agrees with the Defendant that the Plaintiff would have been required to perform those tasks, even if the Defendant had not disposed of its foundry waste at that hazardous waste site. Indeed, Bern, the Plaintiff's expert witness, testified that the NAPS layer would have formed, as a result of Plaintiff's waste alone.[73] Nevertheless, the

the Plaintiff's request for declaratory relief, which is discussed below.

71. The purpose of a remedial investigation is to investigate the extent of the environmental hazards posed by a particular site, while a feasibility study examines the possible remedies for those hazards. Thus, Plaintiff argues that the RI/FS study was not driven by the presence of carcinogenic PAHs in the groundwater, since those tasks would have had to be performed even if that type of hazardous substance had not been present. This Court does not agree. While it is possible to imagine that a remedial investigation of the GDA would have been required, even in the absence of Plaintiff's disposal of large quantities of organic wastes containing carcinogenic PAHs, the evidence established that the RI/FS was conducted with the knowledge that those hazardous substances were contained in that disposal site. Indeed, well before the Remedial Investigation began, the Plaintiff knew that the waste which it had disposed of in the GDA contained a high content of PAHs. For instance, in 1979, Plaintiff responded to a Congressional questionnaire by stating that the coal tar that it had processed at its facility consisted primarily of PAHs. *See* Plaintiff's Exhibit 14. A primary purpose of the remedial investigation was to determine the extent of the spread of those substances in the groundwater. The feasibility study examined the methods of remedying the environmental harm caused by them. Therefore, the Court finds that the RI/FS, like the study of the NAPS layer, the construction of the slurry wall and the pump and treat remedy, was driven by the presence of carcinogenic PAHs. Moreover, the Plaintiff, the party with the burden of proof, did not present any evidence as to the type and expense of the RI/FS that would have been required at the GDA, if carcinogenic PAHs were not present at that hazardous waste site.

72. Those hazardous substances are ammonia, which must be reduced to 0.5 parts per million; chloride, which must be reduced to 250 parts per million; total cyanide, which must be reduced to 0.2 parts per million; phenolics, which must be reduced to between 0.3 and 3.5 parts per million; benzene, which must be reduced to 0.005 parts per million; and naphthalene, which must be reduced to 0.69 parts per million. The waste disposed of at the GDA by the Defendant either did not contain those hazardous substances, or contained them in levels below the cleanup standards established by the ROD.

73. The presence of the NAPS layer necessitated its study and the construction of the slurry wall, which will prevent the hazardous substances contained in that layer from migrating throughout the aquifer.

Court cannot agree with the Defendant that it is absolved of responsibility for contributing to the response costs incurred by the Plaintiff for performing those tasks. Bern also testified that the mixing of the hot, liquid waste disposed of by the Plaintiff with the Defendant's foundry waste caused carcinogenic PAHs to migrate to the groundwater, where those chemicals now rest as part of the NAPS layer. In other words, the hazardous substances disposed of in the GDA by the Defendant have contributed to the NAPS layer. That layer has brought about the need to conduct the study and to construct the slurry wall. Moreover, appellate courts, including the Sixth Circuit, have rejected the contention that the defendant in a CERCLA contribution action is without liability, merely because the plaintiff would have incurred the same costs to remediate the site even if the defendant had not deposited hazardous substances therein. For instance, in *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648 (6th Cir. 2000), the District Court granted summary judgment in favor of two defendants in a CERCLA contribution action. In particular, the District Court held that the defendants' release of hazardous substances at the site was not sufficiently significant to have caused the plaintiff to incur response costs.[74] Upon appeal, the Sixth Circuit reversed, holding that CERCLA does not contain such a causation requirement. In *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177 (9th Cir.2000), the Ninth Circuit reached the same conclusion. Therein, the District Court entered judgment in favor of the plaintiff in a CERCLA contribution action. In particular, the District Court rejected the defendant's contention that it should not be required to contribute to the cleanup of the hazardous waste site, since the plaintiff would have incurred the same response costs even if it (defendant) had not disposed of waste at the site. Upon appeal, the Ninth Circuit affirmed, concluding that CERCLA does not contain such a causation requirement. *See also, Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886 (10th Cir.2000) (noting that the plaintiff in a CERCLA contribution action need not prove a specific causal link between costs incurred and an individual responsible party's waste). In *Control Data, supra*, the Eighth Circuit held that the defendant was liable to contribute to *any* response costs, which the plaintiff had incurred, once it is deemed liable under § 107(a). 53 F.3d at 935–36. Certainly, the expenses incurred by the Plaintiff to construct the slurry wall and to study the NAPS layer constitute response costs.

■ Since the cleanup of the GDA is being driven by the presence of carcinogenic PAHs at the GDA, a logical basis for equitably and fairly allocating the response costs that the Plaintiff has and will incur is to require each party to bear the portion of the total costs which equal the percentage of the carcinogenic PAHs that came from the waste each deposited in the GDA. The difficulty with that approach is that the Court is not able to conclude, based upon the evidence presented at trial, what percentage of those hazardous substances is attributable to each of the parties. The Defendant argues that there is evidence that only 0.289% of the carcinogenic PAHs in the GDA came from the waste it deposited, with the Plaintiff being responsible for the remainder of the deposit of those substances. Ham did testify to that effect, in addition to presenting other computa-

---

**74.** The District Court did *not* base its decision on the proposition that the defendants' equitable share of the costs of remediating the site was zero, because their contribution of waste to that site was insignificant. Indeed, the District Court did not address the question of equitable allocation, given its conclusion that the defendants could not be held liable for contribution.

tions. However, the Court cannot find the manner in which Ham arrived at that figure to be of sufficient reliability upon which to rest an equitable allocation. As Ham conceded, this computation had a major disadvantage, since he had based his computation upon only two samples of waste from the Defendant and limited data from the GDA.[75] Moreover, Ham used this computation to support his basic opinion that the Defendant had disposed of a small percentage of the hazardous substances that are driving the cleanup at the GDA, and not to support a definite opinion that the Defendant was responsible for only 0.289% of the carcinogenic PAHs at the GDA.[76] In other words, the Defendant is ascribing more significance to Ham's testimony than did Ham himself.

An alternative to allocating response costs on the basis of the percentage of carcinogenic PAHs in the groundwater below the GDA attributable to each party is to focus upon the percentage of PAHs, whether carcinogenic or otherwise, which each of the parties contributed to the GDA.[77] While this method does not tie allocation of response costs to the precise hazardous substances driving the cleanup of the GDA (i.e., carcinogenic PAHs), there was no reliable evidence introduced at trial that the PAHs contributed by one party

had a higher concentration of such carcinogenic compounds than those originating with the other. Moreover, it should be noted that the PAHs contributed by the parties originated from similar processes. The Plaintiff created PAHs through its coking operations, during which coal was burned in an oxygen deficient environment. Coal tar, which was the waste product of the coking operations and which was processed at the coal tar plant, has a high PAH content. The PAHs which the Defendant disposed of at the GDA were created by the process known as pyrolysis, when seacoal in the molding sand partially burned in an atmosphere from which the oxygen had been removed. There was no evidence that either's party's processes would have caused a greater concentration of carcinogenic PAHs to be created (when compared to the non-carcinogenic variety of those compounds). Therefore, the Court concludes that the total percentage of PAHs disposed of by each party (whether carcinogenic or not), which each of the parties contributed to the GDA, is an equitable and fair manner of allocating the Plaintiff's response costs. Based upon the testimony of Bern, the Court finds that the Defendant disposed of between 2% and 3% of the PAHs at the GDA, while the Plaintiff was responsible for the remainder.[78]

75. That sampling had been done during the Remedial Investigation. Its purpose was not to obtain data by which the relative contributions of carcinogenic PAHs by the parties to the GDA could be determined. Rather, the purpose of that activity was to investigate the extent of the problems at the GDA.

76. The Plaintiff argues that Ham's testimony was not reliable, because it was based upon a study that had been conducted by graduate students at the University of Wisconsin, where Ham is a professor. Although the Court agrees with the Plaintiff's characterization of the reliability of the graduate students' study, it cannot agree with the assertion that Ham based his testimony, concerning the figure of 0.289%, on that study. Rather, that testimo-

ny was based upon samples taken from the GDA and two piles of sand found lying in its vicinity.

77. Above, the Court has rejected, as unreliable, Ham's testimony that 0.289% of the carcinogenic PAHs contained in the GDA came from Defendant. At this point in its Decision, the Court considers the total PAHs (both carcinogenic and non-carcinogenic) contributed by each party.

78. According to Bern, the Defendant contributed 2.86% of the PAHs disposed of at the GDA. Given the fact that Bern's computations were based upon information that was decades old, this Court is unwilling find that the Defendant contributed such a precise percent-

Indeed, Ham, an expert witness who testified on behalf of the Defendant, indicated that Bern's computations were accurate and that they provided a permissible and reasonable manner of determining the parties' relative responsibility for the carcinogenic PAHs at the GDA. Accordingly, the Court finds that the Defendant is liable for between 2% and 3% of the Plaintiff's response costs.[79]

Having concluded that the percentage of PAHs that each party contributed to the GDA is the equitable and fair factor to employ to allocate the response costs for the RI/FS, the study of the NAPS layer and the implementation of the remedy selected by the EPA in the ROD, the Court must now determine what that percentage is. Is it 2%, 3% or some figure between those two? The Court finds that 2% is the equitable and fair amount of response costs to allocate to the Defendant. Two factors cause this Court to select the 2% figure. *First*, for more than 20 years, the Plaintiff exercised control over the activities of the GDA, as the owner and operator of that facility. The fourth Gore factor provides that courts should consider, *inter alia*, the degree of control that the parties have exercised over the hazardous waste facility. Moreover, courts have recognized that ownership and control of a hazardous waste site is an appropriate factor to consider when equitably allocating response costs. *See e.g., R.W. Meyer*, 932 F.2d at 573. As the owner and operator of the GDA, the Plaintiff had the ability to prevent the disposal of waste at that site, in the manner in which it was done, a manner which permitted hazardous chemicals to be released to the environment. The Plaintiff's failure to do so supports limiting Defendant's liability for response costs to 2%. *Second*, the Plaintiff facilitated the release of the PAHs contained in the waste disposed of by the Defendant, by mixing hot, liquid wastes originating from the operations of the coal tar plant with the foundry wastes disposed of by the Defendant. The PAHs that the Defendant contributed to the GDA were created by the process known as pyrolysis, when some of the seacoal, contained in the mixture of sand and other material of which the molds were composed, heated in an oxygen deficient environment. The PAHs in Defendant's foundry waste were bound to the sand. Since PAHs are insoluble, it is unlikely that a significant portion of those substances bound to the sand in Defendant's waste would have migrated to the groundwater if the Plaintiff had not mixed its hot, liquid waste with the foundry sand which the Defendant had disposed of in the GDA.[80] Therefore, the actions of the Plaintiff are partially responsible for the Defendant's contribution of PAHs to the groundwater below that site. This fact further buttresses the Court's conclusion that the Defendant should be liable for only 2% of

age of PAHs (i.e., to the nearest hundredth of 1%).

79. The Defendant argues that allocating response costs on the basis of the parties' relative contributions of PAHs is unfair, because such a method is not tied directly to carcinogenic PAHs, the presence of which is driving the cleanup of the GDA. While the method selected by the Court is not perfect, it is nevertheless the best method of equitably allocating response costs, because of the reliability of Bern's computations concerning the parties' relative contributions of PAHs.

80. The Plaintiff did not present any evidence that a landfill containing only foundry waste would have required remediation. Indeed, the Defendant presented evidence that it disposed of its foundry waste at a number of locations in the Ironton area, in addition to the GDA, without any indication that carcinogenic PAHs have migrated from those other locations to the groundwater below those sites.

the response costs, rather than for 3% or for some amount between 2% and 3%.[81]

There are other possible alternative methods of allocating the Plaintiff's response costs between the parties. For instance, the Court could merely allocate those costs on a per capita basis, thus requiring each of the responsible parties, the Plaintiff and the Defendant, to pay 50% of the costs of the cleanup of the GDA. The Court rejects that approach, because it ignores the quantity of waste that each of the parties disposed of in the GDA and, more importantly, the toxicity of that waste. As is indicated above, the amount and toxicity of the parties' waste are two Gore factors that courts and Congress have indicated are appropriately considered when making an equitable allocation. Herein, the evidence presented established that the Plaintiff is responsible for 72% of the total waste in the GDA (regardless of toxicity), while the Defendant was responsible for 28% of same.[82] More importantly, a per capita allocation would ignore the fact that the content of the parties' waste was significantly different. The Defendant's waste was overwhelmingly composed of inorganic sand, with a small PAH content. Thus, the De-fendant's waste was largely non-toxic.[83] The Plaintiff's waste, on the other hand, was largely organic and contained a high content of toxic PAHs.[84] Courts have held that it is appropriate to allocate a greater share of responsibility to a party whose waste is more toxic. For instance, in *Control Data*, the Eighth Circuit concluded that the District Court had not abused its discretion, by allocating one-third of the cleanup costs to the defendant, since its waste was more toxic than that contributed by the plaintiff, even though the defendant had contributed only 10% of the hazardous substances that had to be cleaned up. 53 F.3d at 938. This Court agrees and chooses not disregard the relative toxicity of the parties' waste, when allocating response costs. Therefore, an allocation of responsibility on a per capita basis would be inequitable and unfair.

Similarly, the Court declines to allocate equitable shares on the basis of the relative amount of waste that the parties disposed of in the GDA (i.e., 72% to the Plaintiff and 28% to the Defendant). Such a method of allocation, while less inequitable and unfair than relying upon a per capita method, still ignores the toxicity of the waste that the parties deposited in the

81. Parenthetically, the Defendant introduced testimony that it had disposed of 1.44% of the organic waste in the GDA, while the Plaintiff was responsible for the remainder of those compounds. Although the Court has selected the percentage of PAHs contributed to the site as the appropriate factor to consider in equitably allocating the parties' liability, testimony from a witness called by Defendant, that its contribution of organic waste is only .56% less (hardly over 1/2 of 1%) than the 2% figure selected by the Court, lends support to the fairness of that figure.

82. Those figures are based upon the testimony of Robert Ford, director of site remediation for the Plaintiff. The Court finds that testimony to be credible and accepts it to be the most reasonable estimate of the relative contributions of the parties to the total amount of waste disposed of at the GDA. Parenthetically, although the Defendant did not stipulate to the accuracy of Ford's calculations, its expert witnesses, Ham and Mundell, both utilized Ford's computations in their testimony, although Mundell testified that he believed Defendant's contribution to be only 24%.

83. Indeed, the Defendant presented credible evidence that, if it alone had deposited waste in the GDA, no remedy other than a cap would have been required.

84. As the name suggests, the Plaintiff processed coal tar at the its coal tar plant. That material was a by-product of its coking operations, which were also located in Ironton. Coal tar has a high PAH content.

GDA. Moreover, to allocate response costs on that basis would ignore the inescapable fact that the presence of carcinogenic PAHs (not waste in general) is driving the cleanup of the GDA.[85]

The Defendant also presented evidence concerning an alternative method of allocation called "ratio of stand alone costs." According to the Defendant, an application of that method of allocation supports its contention that it should be required to contribute no more than 1% of the total response costs for the GDA. That method assigns to each responsible party a proportion of the total response costs that corresponds with a ratio of the costs that each would have incurred, if it alone had disposed of its waste in the facility. The Defendant argues that the Plaintiff would have incurred the entire obligation of $30,000,000 to remediate the GDA, if it alone had disposed of its waste in that facility. The Defendant also contends that it would have incurred response costs of only $320,000, to remediate the GDA, if it alone had deposited wastes therein. That figure is based upon testimony by Mundell, who indicated that, if Defendant alone had disposed of waste in the GDA, the only required remedy would be the construction of a cap. He also testified that it would have cost the Defendant only $320,000, to perform that activity. Since the ratio of those two figures is approximately 1.1%, the Defendant argues that this method lends credence to its basic assertion that it should bear no more than 1% of the total response costs. The evidence supports Defendant's assertion that Plaintiff would have incurred the entire obligation of $30,000,000, if it alone had disposed of its waste at the GDA. In addition, the Court concurs with Defendant that a cap would have been the only required remedy, if *its* waste alone were in the GDA. However, the Defendant's reliance on the ratio of stand alone costs, as a method of equitable allocation which provides support for its basic premise that 1% is the outer limit of its liability, loses credence when one examines the evidence that Defendant's response costs would have been only $320,000, if *its* waste alone were in the GDA. Mundell arrived at that figure by multiplying the anticipated cost of the cap by 30% (the approximate percentage of the total waste that Defendant had contributed to the GDA). A primary problem with his analysis is that Mundell was not able to explain adequately why Defendant would have had to expend of only 30% of the total cost of the cap, if its waste alone were in the GDA. The evidence established that a cap would have been required for the GDA, even if only the Defendant's foundry waste was contained therein. Therefore, it is not reasonable to conclude that the Defendant would have been required to expend only 30% of the total cost of that cap, if it alone had disposed of waste in the GDA. In addition, Mundell's analysis completely ignored the fact that, if only Defendant's waste were in the GDA, it would have incurred a substantial expense to fill the remainder of the GDA, in order to bring it up to grade, a task which would have had to be completed before a cap could have been placed on that waste disposal site.[86] Moreover, Mundell himself testified that in the real world, stand alone wastes do not exist. VII Transcript (Doc.

85. The Plaintiff has argued that there is not a scientific or technical basis for allocating response costs, since the waste disposed of by the parties has become mixed. The Court agrees with the Plaintiff concerning the mixture of the parties' waste and the inability to determine from which waste came a particular molecule of benzo(a)pyrene in the groundwater below the GDA. Nevertheless, it is ap-

propriate to employ science, in the form of testimony of the Plaintiff's expert witness Bern, to determine the parties' relative contributions of PAHs to the GDA.

86. Given that the Plaintiff contributed 72% of the volume of waste contained in the GDA, the Defendant would have been required to add a significant amount of fill, if it alone had deposited waste to that site.

# 167) at 142. For these reasons, the Court concludes that a ratio of stand alone costs does not support the Defendant's basic premise that it should be held liable for no more than 1% of the response costs for the GDA.[87]

An analysis of the "Gore factors" supports the Court's conclusion that the Defendant is liable for 2% of the response costs that the Plaintiff has incurred (other than costs associated with the cap). The first factor, the ability of the parties to demonstrate that their contributions to the release of hazardous substances can be distinguished, does not alter that conclusion. Simply stated, there is no way to distinguish the molecules of carcinogenic PAHs that came from the Plaintiff's waste, from those that originated with the Defendant. The second through fourth factors require the Court to consider the amount of hazardous waste deposited by each of the parties; the degree of toxicity of their waste; and the degree of their involvement in the generation, transportation, treatment, storage, or disposal of that waste. Above, the Court has discussed how those considerations influence its conclusion that the Defendant is liable for 2% of the response costs for all aspects of the cleanup of the GDA other than the cap. The Court will not repeat that discussion. The parties did not present any evidence on the fifth Gore factor, the degree of care exercised by the parties with respect to the hazardous substances.[88] Therefore, that factor does not cause the Court to alter its conclusion regarding the level of the Defendant's responsibility.

The Plaintiff argues that the sixth Gore factor, the degree of cooperation by the parties with federal, state and local officials to prevent harm to the public health and the environment, serves as the basis for the Court to allocate a greater portion of the response costs to the Defendant. In particular, the Plaintiff argues that the Defendant not only failed to cooperate with the EPA and the OEPA, by ignoring the unilateral order to implement the ROD, but also misled those agencies, by mischaracterizing the content of the waste that it had disposed of in the GDA. The Plaintiff also notes that it has complied with the orders of the EPA to conduct the RI/FS and to implement the ROD, and, thus, that it has borne the entire cost of remediation to date, while the Defendant has contributed nothing. Given the facts of this case, the Court cannot agree with the Plaintiff that the sixth Gore factor is the basis for allocating an increased share of liability to the Defendant.

With respect to Defendant's alleged mischaracterization of the content of its waste, the Plaintiff relies upon a number of letters that Defendant sent to the OEPA during the 1980's, in which it indicated that its foundry waste did not include hazardous substances. The Plaintiff points out that the statements contained in those letters were false, since it is uncontroverted that the Defendant's foundry waste contained carcinogenic PAHs. The Court does not agree. The statements in those letters were based on an analysis of its foundry sand that the Defendant had conducted.[89] In addition, the Plaintiff's argument ig-

---

87. In support of this contention, the Defendant has cited the testimony of Dr. George Hall, a economist who was retained for this litigation. Hall's testimony does not alter this Court's conclusion, since that testimony was based upon Mundell's calculations.

88. Indeed, the Defendant argues that the fifth Gore factor is inapplicable (*see* Doc. # 178 at

22), while the Plaintiff has not even mentioned that factor in its post-trial memoranda.

89. The Plaintiff also contends that the Defendant did not conduct an adequate analysis of its waste, before informing the OEPA that it did not contain hazardous substances. That analysis was conducted by entity retained by Defendant, BCM Laboratories, on only one

nores the fact that the Defendant did not know that its waste contained carcinogenic PAHs, when, in the 1980's, it sent letters to that regulatory agency, indicating that its waste did not include such hazardous substances. Indeed, in the Remedial Investigation, the Plaintiff itself did not indicate that the Defendant's waste contained that type of substances. Moreover, Robert Ford, who had been involved in the RI/FS as Plaintiff's director of site remediation, testified that he was surprised that the EPA had ordered the Defendant to implement the ROD. Therefore, this Court cannot find that the Defendant knowingly misled any regulatory agency concerning the content of the waste it had disposed of at the GDA. Moreover, the Plaintiff did not present any evidence that the Defendant's failure to inform the EPA and the OEPA that its waste contained small quantities of carcinogenic PAHs affected, in any manner, the remedy selected for the GDA or caused the RI/FS to be more difficult or expensive. The remedy for the GDA is being driven by the presence carcinogenic PAHs in the groundwater below that hazardous waste site. The regulatory agencies were fully aware that the Plaintiff's

waste contained significant quantities of those substances.

With respect to the Defendant's failure to comply with the order of the EPA to implement the ROD and to contribute to the costs of the remediation of the GDA, the Court likewise cannot conclude that this is the basis for allocating a greater share of responsibility to the Defendant.[90] This is not a case where the cleanup has been preformed by one of two parties that share relatively equal responsibility for the conditions at a hazardous waste site. On the contrary, the Plaintiff was the owner and operator of the GDA. It deposited the overwhelming majority of hazardous substances into that facility. Its waste was largely organic, with a high content of PAHs, while the Defendant's waste was composed overwhelmingly of inorganic sand which posed no risk to the environment. Defendant's waste had a small PAH content. The fact that the Defendant, whose responsibility for the conditions at the GDA pales in comparison to that of Plaintiff, chose not to comply with an order from the EPA does not cause this Court to allocate a greater share of responsibility to that non-complying party.[91]

sample of spent foundry sand from one of the three molding lines that the Defendant had operated at its Ironton plant. Moreover, the analyzed sand had not been commingled with other plant waste, as was the Defendant's custom with the waste that it disposed of in the GDA. Nevertheless, this Court does not consider those matters to render the Defendant's analysis inadequate. The evidence established that the carcinogenic PAHs disposed of at the GDA by the Defendant were created when some of the seacoal, which had been mixed with sand and other substances to form a mold, partially burned after molten metal had been poured into that mold. There is no indication that this occurred in some but not all of the Defendant's molding lines. Therefore, the failure to examine spent foundry sand from all three molding lines did not render the analysis inadequate. Moreover, given that the carcinogenic PAHs were created in the molding process, examining only

spent foundry sand, rather than commingled waste, does not cause this Court to conclude that the analysis was inadequate.

90. Although the Plaintiff repeatedly requested the EPA to enforce its order against the Defendant, that regulatory agency has taken no action.

91. In support of this argument, the Plaintiff relies upon *Central Maine Power Co. v. F.J. O'Connor Co.*, 838 F.Supp. 641 (D.Me.1993). Therein, the District Court concluded that the party which had contributed a significant share of the hazardous substances to a hazardous waste site should bear a proportionally greater share of responsibility, because it had failed to cooperate in the efforts to remediate that site. Herein, by contrast, the Defendant's contribution of hazardous substances to the GDA was not significant, in comparison to that of the Plaintiff.

Moreover, through this litigation, the Plaintiff has a mechanism to force the Defendant to pay its equitable share of the response costs for the GDA. In addition, as will be more fully set forth, *infra*, the Plaintiff is entitled to prejudgment interest on any sum it recovers; therefore, it is not required to bear the burden of providing free financing to the Defendant for that party's equitable share of the cost of remediating the GDA.

Thus, while the Court is in complete agreement with the Plaintiff that, in the appropriate case, a party's failure to cooperate with the cleanup of a hazardous waste site could serve as the basis for equitably allocating a greater share of the response costs, for reasons discussed above, the Court does not find this to be such an appropriate case.

In sum, all tasks associated with the cleanup of the GDA, except for the cap, is being driven by the presence of carcinogenic PAHs in that facility and in the groundwater below it. Although there was no reliable evidence from which the Court could find the percentage of those substances which were deposited by each of the parties, there was reliable evidence as to the percentage of PAHs (whether carcinogenic or otherwise) for which each is responsible. Accordingly, based upon foregoing, the Court finds that the Defendant is liable for 2% of the Plaintiff's response costs, except for the costs associated with the cap.[92]

### 2. Plaintiff's Response Costs for the Cap

 Unlike the other tasks performed by the Plaintiff, for which it has incurred response costs, the cap is not remedy driven. Rather, the Court finds that construction of the cap on the GDA would have been required, even if carcinogenic PAHs had not migrated to the groundwater. In other words, the need to place a cap on the GDA is driven by the fact that waste has been disposed of in that facility. For instance, Mundell testified that if Defendant's waste alone had been deposited in the GDA, only a cap would have been required to remedy the site. Mundell also testified concerning his experiences at the A.Y. McDonald site, a hazardous waste facility located in Dubuque, Iowa. That location was a foundry monofill (i.e., a landfill into which foundry waste alone has been deposited), which contained waste similar to that deposited by the Defendant at the GDA.[93] Despite the fact that foundry sand had been disposed of at that site, carcinogenic PAHs had not migrated to the groundwater. Mundell testified that the remedy selected at that site was a cap, as well as solidification of the material contained therein. The testimony of Mundell, a witness who testified on behalf of the Defendant, causes this Court to find that a cap for the GDA would have been required, even if carcinogenic PAHs had not migrated from that hazardous waste site to the groundwater below or had not even been deposited in great quantity in that facility. Since the need for a cap on the GDA is not being driven by the contents contained therein, it is neither equitable nor fair to allocate response costs for that aspect of the remedy selected by the EPA on the basis of the percentage of PAHs contributed by each of the parties.

---

**92.** The Plaintiff argues that the Court should consider the benefit received by the Defendant, from being permitted to dispose of its waste at the GDA for over 25 years. By requiring the Defendant to compensate the Plaintiff for a portion of its response costs, the Court is requiring the Defendant to pay for that benefit, to the extent that the receipt of that benefit contributed to the environmental harm at the GDA.

**93.** The foundry involved at that site produced brass castings. One of the waste products of such a process is lead, which is not a significant component of the waste that Defendant disposed of at the GDA.

Rather, the most equitable manner is to allocate responsibility for the cost of the cap on the basis of the percentage of their total contribution of waste to the GDA. Since the Defendant disposed of 28% of the waste in that facility, the Court finds that it is liable for 28% of the cost of the cap.

### E. Declaratory Relief and Prejudgment Interest

In addition to seeking contribution for past costs, the Plaintiff seeks two additional forms of relief, to wit: a declaratory judgment that the Defendant is obligated to pay a portion of the costs that it (Plaintiff) has incurred since December 31, 1994, and will incur in the future, as well as prejudgment interest. The Court will address these two issues in the above order.

### 1. Declaratory Judgment

 Section 113(g)(2) of CERCLA expressly provides that a District Court "shall enter a declaratory judgment on liability for response costs ... that will be binding on any subsequent action or actions to recover further response costs...." 42 U.S.C. § 9613(g)(2). The purpose of this provision is to avoid the necessity of relitigating issues in subsequent litigation that have been decided in an initial action, seeking contribution of response costs incurred to date. In *Kelley v. E.I. DuPont de Nemours Co.*, 17 F.3d 836 (6th Cir.1994), the Sixth Circuit noted that the entry of a declaratory judgment is mandatory. *Id.* at 844. Accordingly, the Plaintiff is entitled to a declaratory judgment that the Defendant's equitable share

of all response costs incurred by the Plaintiff after December 31, 1994, except for costs associated with the cap, and in the future, will be 2%.[94] With respect to the cap, the Defendant's equitable share will be 28%.

### 2. Prejudgment Interest

 Section 107(a) of CERCLA provides, in pertinent part:

> The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (I) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

42 U.S.C. § 9607(a). In *United States v. Township of Brighton*, 153 F.3d 307, 321 (6th Cir.1998), the Sixth Circuit said that an award of prejudgment interest under § 107(a) is mandatory. In *Bancamerica*, a case upon which the Sixth Circuit relied in *Brighton*, the Tenth Circuit held that prejudgment interest must be awarded to a party seeking contribution under § 113(f),

**94.** As the Defendant argues, the Plaintiff's entitlement to recover those costs will depend upon whether post-trial and future response costs have been and will be incurred in a manner that is consistent with the NCP. However, the manner in which the Court has resolved the issue of whether Plaintiff has incurred response costs in a manner that is consistent with the NCP would seemingly make it unlikely that it has acted in a manner that is inconsistent with those regulations, with respect to other such costs incurred and to be incurred after December 31, 1994. Nevertheless, that is an issue which cannot be resolved herein.

in the same manner that it would be awarded to a party bringing a cost recovery action under § 107(a), since an action under § 113(f) is governed by the requirements of § 107(a). 100 F.3d at 799–802. This Court agrees with the result reached therein and the rationale employed. Accordingly, it concludes that the Plaintiff is entitled to an award of prejudgment interest.

The Court is not able, however, to answer the inevitable, next question, to wit: what amount of prejudgment interest is the Plaintiff entitled to recover.[95] Section 107(a) identifies two events, the later of which will trigger the accrual of interest. Those events are the date upon which payment of a specified amount is demanded in writing, or the date of the expenditure at issue. Herein, the Plaintiff began incurring response costs even before 1984, when it entered into the Consent Judgment with the EPA to conduct the RI/FS. However, there is no evidence that Plaintiff demanded a specified amount in writing at any time prior to the filing of the Complaint. In that pleading, the Plaintiff demanded that the Defendant pay compensation in the sum of $3,500,000, for the response costs that it (Plaintiff) had incurred. *See* Doc. # 1. Courts have held that a complaint seeking to recover such costs meets the written demand requirement of § 107(a). *See Bancamerica,* 100 F.3d at 801; *In re Bell Petroleum Services, Inc.,* 3 F.3d 889, 908 (5th Cir.1993); *American Color & Chemical,* 918 F.Supp.

at 960. Accordingly, the Court concludes that the Plaintiff is entitled to recover prejudgment interest on its expenditures for response costs incurred prior to the filing of the Complaint, from the date upon which that filing occurred. With respect to its expenditures for response costs after that date, the Plaintiff is entitled to prejudgment interest from the date that such expenditures were incurred.

### III. Conclusions of Law

1. This Court has subject matter jurisdiction over this litigation pursuant to 42 U.S.C. § 9613(b), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.[96]

2. The Defendant is entitled to judgment on Plaintiff's claim for contribution under the law of Ohio, since the Plaintiff has voluntarily withdrawn that claim.

3. Congress clearly intended that CERCLA be applied to conduct which occurred before that statute was enacted.

4. CERCLA does not violate the Commerce Clause of the United States Constitution.

5. Since Plaintiff contributed to the conditions at the GDA which must be remediated, it is limited to asserting a claim for contribution under § 113(f)(1) of CERCLA, rather than being entitled to seek to recover its costs, in accordance with § 107(a) of that statute. As a consequence, the Plaintiff has the burden of proof on its request for contribution, and the Defendant's counterclaim for contribution is moot.

---

**95.** In its Post-trial Memorandum, the Plaintiff states that it will not be possible to compute an amount of prejudgment interest until after the Court has determined the Defendant's share of liability. *See* Doc. # 184 at 87. Courts have frequently delayed the computation of prejudgment interest, until after it determines the amount of response costs for which the defendant is liable. *See Bancamerica,* 100 F.3d at 802 (and cases cited therein).

**96.** As an alternative vehicle of subject matter jurisdiction, it appears that there is complete diversity between the parties and that, therefore, the Court could conceivably exercise jurisdiction over the Plaintiff's state law claim, pursuant to 28 U.S.C. § 1332. However, since the Plaintiff has alleged that the Court can exercise subject matter over its state law claim "under principles of ancillary and pendent jurisdiction" (Doc. # 1 at ¶ 5), this Court does not base its jurisdiction upon § 1332.

6. A plaintiff can recover contribution under § 113(f)(1) of CERCLA, only by establishing that the defendant is liable under § 107(a) of that statute. Thus, the Plaintiff had the burden of proving that the Defendant is liable under § 107(a) of CERCLA. One of the elements of such liability is that the Plaintiff incur response costs in a manner that is consistent with the NCP. The applicable standards to ascertain such compliance is found in 40 C.F.R. § 300.700(C)(3). The evidence presented causes this Court to find, by the preponderance of the evidence, that the Plaintiff has met both of the alternative standards contained in that regulation. In addition, a plaintiff in a CERCLA contribution action must establish four other elements, to wit: that the defendant is within one of the four categories of potentially responsible parties set forth in § 107(a); that the site is a "facility," as defined by § 101(9) of CERCLA, 42 U.S.C. § 9601(9); that there has been a release or threatened release of hazardous substances at the "facility"; and that the plaintiff incurred necessary "response costs," responding to that release or threatened release. Herein, the Plaintiff proved, by the preponderance of the evidence, each of those four elements.

7. Allocation of response costs is governed by § 113(f) of CERCLA, which permits a court to utilize such "equitable factors as the court determines appropriate," including the Gore factors. An application of equitable factors, including the Gore factors, causes this Court to find that the Defendant is responsible for 2% of the Plaintiff's response costs, except for those associated with the cap. The Court finds that the Defendant is responsible for 28% of the Plaintiff's response costs associated with the cap.

8. The Plaintiff is entitled to a declaratory judgment that the Defendant's equitable share of response costs incurred after December 31, 1994, and in the future will be 2% of the Plaintiff's response costs, except for those associated with the cap, and 28% of such costs pertaining to the cap.

9. Plaintiff is entitled to prejudgment interest, in accordance with § 107(a) of CERCLA, on all expenses incurred before the filing of this lawsuit, from the date upon which that filing occurred. The Plaintiff is entitled to prejudgment interest on all other expenses from the date upon which the Plaintiff incurred those expenditures.

The Court is not able to enter final judgment in this litigation at this point, since two issues remain unresolved. *First,* there is the question of the precise amount of prejudgment interest to which the Plaintiff is entitled. *Second,* in their post-trial memoranda, the parties have not identified what precise portion of the $10,461,137, incurred by Plaintiff prior to December 31, 1994, to implement the ROD by conducting the RD/RA, is associated with the cap. In order to resolve those two issues, the Court directs counsel to confer and to attempt to enter into a stipulation regarding them. Counsel shall be afforded 30 days in which to attempt to enter into such an agreement. If their efforts are successful, an acknowledgment to that effect should be made, and the Court will enter a Supplemental Opinion and direct that judgment be entered in this litigation. If the efforts of counsel are unsuccessful, the Court should be so advised. A telephone conference call will be scheduled, in order to decide upon the manner of resolving the outstanding issues.